NO. 4-05-0709     Modified filed:  5-17-07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| ROBERT N. POINDEXTER, MIRL W. | ) | Appeal from |
| WHITAKER, MAURICE S. HARDY, | ) | Circuit Court |
| VIRGINIA T. McCULLEY, ROGER O. | ) | Sangamon County. |
| MEREDITH, ORVILLE DAVIS, | ) | No. 04MR305 |
| CATHERINE JOSEPHSON, MARGARET | ) | |
| GONET, and MARY LOU DICKENS, | ) | |
| Plaintiffs-Appellees, | ) | |
| v. | ) | |
| STATE OF ILLINOIS, Acting Through THE | ) | |
| DEPARTMENT OF HUMAN SERVICES, CAROL | ) | |
| ADAMS, Its Director; THE ILLINOIS | ) | |
| DEPARTMENT OF PUBLIC AID, n/k/a | ) | |
| THE ILLINOIS DEPARTMENT OF HEALTHCARE | ) | |
| AND FAMILY SERVICES; and BARRY S. | ) | Honorable |
| MARAM, Its Director, | ) | Leo J. Zappa, Jr., |
| Defendants-Appellants, | ) | Judge Presiding. |

MODIFIED UPON DENIAL OF REHEARING

JUSTICE MYERSCOUGH delivered the opinion of the court:

On May 3, 2005, the trial court issued a memorandum decision and judgment in favor of plaintiffs, which enjoined the Illinois Department of Public Aid (DPA) and the Illinois Department of Human Services (DHS) from seeking any support from the income plaintiffs earned while their spouses were in long-term-care facilities and receiving Medicaid.  The State of Illinois, acting through DHS and DPA, appeals the court's order, arguing (1) plaintiffs failed to exhaust their administrative remedies, (2) plaintiffs forfeited their claims by failing to raise them before the administrative agency, and (3) the court erred in finding the Medicare Catastrophic Coverage Act of 1988 (MCCA) (42

U.S.C. §1396r-5 (2000)) preempted the spousal-support provisions of article X of the Illinois Public Aid Code (305 ILCS 5/10-1 through 10-27 (West 2004)). We reverse the trial court's decision with respect to the third issue regarding preemption and remand.

## I. BACKGROUND

On July 22, 2004, the original plaintiffs (Robert N. Poindexter, Mirl W. Whitaker, Maurice S. Hardy, Virginia T. McCulley, and Roger O. Meredith), each of whom was a "community spouse" of an "institutionalized spouse" as those terms are defined by the MCCA (42 U.S.C. §1396r-5(h) (2000)), filed a complaint for declaratory and injunctive relief against the State, arguing the State was illegally attempting to collect support from them for the support of their respective "institutionalized spouses" who were in long-term-care facilities and had received or were receiving medical assistance under the Medicaid program.

On August 23, 2004, the State moved to dismiss plaintiffs' complaint, alleging plaintiffs had not exhausted their administrative remedies before seeking judicial review. On October 25, 2004, the trial court denied defendant's motion to dismiss.

On January 24, 2005, Orville Davis, Catherine Josephson, and Margaret Gonet filed a motion, asking to join this action as plaintiffs. That same day, the original plaintiffs filed a motion titled "Argument," which was treated by the trial court as a motion for summary judgment. Plaintiffs argued the central issue in this case was whether the State could seek support from the "community spouse" of an "institutionalized spouse" in a long-term-care facility and receiving Medicaid. Under authority found in the Illinois Administrative Code (89 Ill. Adm. Code §103.10 (Conway Greene CD-ROM June 2003)), the State sought spousal support from a "community spouse's" income for the amount his or her income exceeded the minimum monthly maintenance needs allowance (monthly needs allowance) established by the MCCA (42 U.S.C. §1396r-5(d)(3) (2000)). Plaintiffs argued the

State does not have the authority to do this pursuant to the MCCA.

On February 28, 2005, the trial court granted Davis, Josephson, and Gonet's motion to join the case as plaintiffs. On March 29, 2005, Mary Lou Dickens sought leave to join this case as a plaintiff. On May 3, 2005, the court issued its memorandum decision and judgment. In its findings of fact, the court stated the parties had agreed no genuine issues of material fact needed to be decided and the case should be decided on the pleadings. The court found federal law preempted state law governing the issue in this case. The court found pursuant to the MCCA a state is not allowed to seek spousal support from a community spouse's income after the institutionalized spouse has been declared eligible for Medicaid. In support of its finding, the court stated the MCCA does not distinguish between eligibility and posteligibility support. As a result, the court (1) found the State's support claims and collection efforts against the plaintiffs were wrongful and unlawful, (2) enjoined the State from seeking any support from the community spouses for any month in which his or her institutionalized spouse receives Medicaid, and (3) awarded plaintiffs their costs and expenses.

On May 6, 2005, the trial court allowed Dickens' motion to join the case as a plaintiff. On August 1, 2005, the trial court entered a Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)) finding regarding its orders of May 3 and May 6, 2005.

This appeal followed.

## II. ANALYSIS

### A. Exhaustion of Administrative Remedies

The State first argues the trial court should have dismissed plaintiffs' complaint because plaintiffs failed to exhaust their administrative remedies before bringing this claim before the trial court. Our supreme court has stated:

"The exhaustion doctrine includes administrative review in the

circuit court. [Citation.] Where the Administrative Review Law [citation] is applicable and provides a remedy, a circuit court may not redress a party's grievance through any other type of action. [Citation.] The circuit court's power to resolve factual and legal issues arising from an agency's decision must be exercised within its review of the agency's decision and not in a separate proceeding. [Citation.]

This court has, however, recognized several exceptions to the doctrine of exhaustion of administrative remedies. [Citation.] An aggrieved party may seek judicial review of an administrative decision without complying with the exhaustion[-]of[-]remedies doctrine where a statute, ordinance[,] or rule is attacked as unconstitutional on its face. [Citation.] A party may also seek review where issues of fact are not presented and agency expertise is not involved. [Citation.] Moreover, exhaustion is not required if the administrative remedy is inadequate or futile or in instances where the litigant will be subjected to irreparable injury due to lengthy administrative procedures that fail to provide interim relief." Canel v. Topinka, 212 Ill. 2d 311, 321, 818 N.E.2d 311, 319 (2004).

Our supreme court has also held:

"Exhaustion is not required where a statute or rule under which an administrative body purports to act is challenged as unauthorized, since the judicial determination will affect the jurisdiction of the administrative body in all matters, not only in the instant circum-

- 4 -

stances [citation].

*** Where an agency's statutory authority to promulgate a rule and exercise jurisdiction is in issue, no questions of fact are involved. The agency's particular expertise is not implicated in statutory construction. Further, there is virtually no chance the aggrieved party will succeed before an agency where the issue is the agency's own assertion of authority." Landfill, Inc. v. Pollution Control Board, 74 Ill. 2d 541, 550-51, 387 N.E.2d 258, 260-61 (1978).

The trial court did not err in denying the State's motion to dismiss based on plaintiffs' alleged failure to exhaust their administrative remedies. The issue in this case is purely one of law. The parties agree no questions of fact are at issue. As a result, this is not an issue that falls within the particular expertise of an administrative agency, especially considering it involves the interpretation of a federal statute.

### B. Forfeiture of Constitutional Claim

The State next argues plaintiffs forfeited their argument because they did not raise it before the administrative body. The State relies on our supreme court's decision in Arvia v. Madigan, 209 Ill. 2d 520, 809 N.E.2d 88 (2004).

In Arvia, the supreme court stated the general proposition "issues or defenses not raised before the administrative agency are deemed waived and cannot be raised for the first time on administrative review." Arvia, 209 Ill. 2d at 526, 809 N.E.2d at 93. According to the supreme court, this rule has been applied to constitutional issues, even though administrative agencies lack the authority to decide constitutional issues. Arvia, 209 Ill. 2d at 526, 809 N.E.2d at 93 ("As a general

- 5 -

rule, issues or defenses not raised before the administrative agency are deemed waived and cannot be raised for the first time on administrative review. [Citation.] This rule has been applied to constitutional issues, even though the administrative agency lacks the authority to decide such issues. [Citation.]"). However, the court in Arvia refused to find that the plaintiffs in that case forfeited their claims. The court noted that raising constitutional issues before the agency is not a bright-line rule and that the court will not require it, stating, "Rather, we have held that it is 'advisable' to assert a constitutional challenge before the administrative tribunal" Arvia, 209 Ill. 2d at 527, 809 N.E.2d at 94.

The Arvia court made clear it was not deciding whether the rule applied in cases where a party seeks a separate declaratory action in circuit court, as opposed to administrative review. Arvia, 209 Ill. 2d at 526, 809 N.E.2d at 93 ("Assuming, without deciding, that the same waiver rules apply where, as here, the litigant files a separate declaratory[-]judgment action, rather than a complaint for administrative review, we find no waiver under the facts of this case"). In Arvia, the plaintiff had a hearing in front of an administrative law judge, which resulted in an adverse ruling. The statute under which the plaintiff filed his claims expressly granted the administrative agency authority to review the specific claims the plaintiff raised. In addition to these claims, the plaintiff could have raised his constitutional claims as well but chose not to. Instead, the plaintiff raised these constitutional claims in a separate declaratory action filed in circuit court.

Unlike Arvia, none of plaintiffs' claims are explicitly required by statute to be brought before an administrative law judge, and plaintiffs' claims are purely constitutional. Moreover, neither DHS nor DPA, both of which are charged with administering the state's Medicaid program, would have the ability to decide plaintiffs' constitutional claims.

Furthermore, like plaintiffs' constitutional claims in Arvia, there was no factual dispute

before the court. If factual issues were involved, an administrative hearing would have been the preferable forum for plaintiffs' claims, given an agency's particular expertise.

Finally, contrary to the State's assertion, plaintiffs are raising a facial challenge to article X of the Illinois Public Aid Code (Code) (305 ILCS 5/10-1 through 10-27 (West 2004)), because plaintiffs' argument insists that the law itself is unconstitutional based on federal preemption, which this court will discuss in more depth below. In <u>Arvia</u>, the court held that when mounting a facial challenge to a statute, administrative review is not required because the question is purely one of law not requiring an agency's particular expertise. We find because plaintiffs' only claims were constitutional and, therefore, outside the purview of the administrative agency, they did not forfeit their argument here.

## C. Federal Preemption

The State argues the trial court erred in ruling in plaintiffs' favor, holding the spousal-support provisions of article X of the Code were preempted by the MCCA. According to the State, the MCCA does not preempt the State from trying to collect spousal support from a "community spouse" for the amount the "community spouse's" income exceeds the monthly needs allowance. However, plaintiffs argue the MCCA does preclude the State from diverting the "community spouse's" income to help pay for his or her "institutionalized spouse's" care.

This court must determine if, by enacting the MCCA, Congress intended to preempt the Code by rendering compliance with both the MCCA and the Code impossible. If Congress intended the MCCA to preempt state law, it could have done so expressly, by implication, or through a conflict between federal and state law, such that it would be impossible to comply with both. <u>Busch v. Graphic Color Corp.</u>, 169 Ill. 2d 325, 335, 662 N.E.2d 397, 403 (1996). Determining the purpose of Congress is the "ultimate touchstone" of preemption analysis. <u>Weiland v. Telectronics Pacing</u>

Systems, Inc., 188 Ill. 2d 415, 417, 721 N.E.2d 1149, 1151 (1999). Moreover, courts begin with the basic assumption that Congress did not intend to displace state law. Valstad v. Cipriano, 357 Ill. App. 3d 905, 922-24, 828 N.E.2d 854, 872-73 (2005) (holding, inter alia, that the federal Clean Water Act did not preempt Illinois laws allowing the State to collect fees because Congress did not expressly prohibit it, the Act did not fully occupy the entire field of law regarding the regulation of pollution leaving no room for State action, and Illinois law did not conflict with the Clean Water Act rendering it impossible to comply with both).

The MCCA may preempt state law if Congress expresses a clear intent to supercede state law. However, nothing in the MCCA indicates that it intends to affect state law at all. See, e.g., Downhour v. Somani, 85 F.3d 261, 266 (6th Cir. 1996) (noting Medicare contains no express preemption of state law). In Downhour, the court held that an Ohio prohibition on "balance billing" was not preempted by federal Medicare law that allowed the practice, since Congress did not express a wish for national uniformity on that subject. In enacting the MCCA, Congress has not expressly sought to preempt state law, nor does Congress express a desire for national uniformity in applying the provisions of the MCCA. Therefore, there is not express preemption of Illinois laws.

Another way in which Congress could have intended to preempt state law is by implication. If Congress passed the MCCA intending it to occupy the entire field of Medicaid law, leaving no room for state regulation, then all overlapping state laws would be impliedly preempted. However, Congress intended Medicaid to be an example of "cooperative federalism," with both the federal and state governments setting policy. Gillmore v. Illinois Department of Human Services, 218 Ill. 2d 302, 304-06, 843 N.E.2d 336, 338 (2006). While states enjoy wide discretion in administering their Medicaid programs, this discretion is qualified with the mandate to adhere to applicable federal laws. Gillmore, 218 Ill. 2d at 305, 843 N.E.2d at 338; Hines v. Department of Public Aid, 221 Ill.

2d 222, 231, 850 N.E.2d 148, 153 (2006). In Gillmore, the Supreme Court of Illinois upheld an Illinois state law governing how a determination would be made regarding a person's attempt to shelter assets in order to be eligible to receive Medicaid. The court found that Illinois' requirement that any annuities be disbursed in equal payments, as opposed to a large balloon payment at the end of the annuity's term, was permissible under the Medicaid Act (Act) (42 U.S.C. §§1396 through 1396v (2000)). The court determined that the Illinois law, although more stringent than the federal guidelines of the Medicaid Act, still complied with the Act. The court reached the conclusion in Gillmore that the broad guidelines of the Act indicate that Congress clearly did not intend to foreclose states from supplementing federal Medicaid law. Since it is clear that in passing the MCCA Congress left room for state regulation in administering Medicaid, there is no implied preemption of Illinois law.

Therefore, the only way that the MCCA could preempt state law is if it is impossible to comply with both federal and state law or where the state law stands as an obstacle to accomplishment and execution of the full purpose and intent of Congress. Crosby v. National Foreign Trade Council, 530 U.S. 363, 372-73, 147 L. Ed. 2d 352, 361, 120 S. Ct. 2288, 2294 (2000).

To discern the intent of Congress, this court will first evaluate the language of the pertinent sections of the MCCA. Then, this court will consider how the MCCA functions within the entire Medicaid statutory scheme as a whole, of which the MCCA is but one component. However, recognizing the opacity of Medicaid law, this court will also look further to congressional statements, prior decisions, and agency interpretations for guidance.

This court notes that Medicaid law is extremely complicated, and interpretation of its provisions is fraught with difficulty. See Cherry v. Magnant, 832 F. Supp. 1271, 1273 n.4 (S.D. Ind. 1993) (noting that these regulations have been characterized as "'almost unintelligible to the uninitiated'" (Friedman v. Berger, 547 F.2d 724, 727 n.7 (2nd Cir. 1976)) and an "'aggravated assault

on the English language, resistance [sic] to attempts to understand it'" (Friedman v. Berger, 409 F. Supp. 1225, 1225-26 (S.D. N.Y. 1976))).  Nonetheless, this court begins its analysis of the MCCA by observing the primary rule of statutory construction, which is to give effect to the intent of the legislature by looking at the plain language of the statute and giving that language its ordinary and commonly understood meaning.  Paris v. Feder, 179 Ill. 2d 173, 177, 688 N.E.2d 137, 139 (1997). Then, we look to the whole statute, construing each provision with every other section of the statute. Paris, 179 Ill. 2d at 177, 688 N.E.2d at 139.  If the legislature's intent can be ascertained from the plain language of the statute, the legislature's intent must prevail.  Paris, 179 Ill. 2d at 177, 688 N.E.2d at 139.  If examining the language of the specific provisions of the statute within the context of the statute as a whole still fails to reveal congressional intent, the court may look to legislative history to discern intent.  Allstate Insurance Co. v. Menards, Inc., 202 Ill. 2d 586, 591, 782 N.E.2d 258, 261 (2002).

The Act begins, "In determining the eligibility for medical assistance *** the provisions of this section supersede any other provision of this subchapter."  (Emphasis added.) 42 U.S.C. §1396r-5(a)(1) (2000).  Plaintiffs point to the specific clause of the MCCA which states, "no income of the community spouse shall be deemed available to the institutionalized community spouse."  42 U.S.C. §1396r-5(b)(1) (2000).  While this clause, taken alone, seems to be a strict prohibition against making a community spouse's income available to the institutionalized spouse, when read within the context of the entire MCCA, the language does not create such a prohibition.

To give full effect to the language Congress chose when enacting this clause, it is important to analyze it with regard to the overarching principles of the Act as a whole.

"Courts should consider a statute in its entirety, keeping in

mind the subject it addresses and the legislature's apparent objective

- 10 -

in enacting it and avoiding constructions which would render any term meaningless or superfluous. [Citations.] Moreover, this court has a duty to construe a statute in a manner that upholds its validity and constitutionality if it reasonably can be done." Fisher v. Waldrop, 221 Ill. 2d 102, 112, 849 N.E.2d 334, 339-40 (2006).

The introductory language of the MCCA clearly states that the provisions of the MCCA are for the purposes of determining Medicaid eligibility, which would not include issues involving ongoing spousal support. To read the subsection that states "no income of the community spouse" that plaintiffs rely on as extending beyond the scope of an eligibility determination would essentially render the introductory language meaningless.

In this case, it is also important that the legislature used the word "deem" in the statute. "Deeming" is a term of art in the Medicaid context, used for purposes of determining eligibility. Assets owned by each spouse are added together, and each spouse is "deemed" to own half, irrespective of any state's laws concerning community property. 42 U.S.C. §1396r-5(b)(2)(A)(ii) (2000). Deeming income between spouses is part of the eligibility process. Since the MCCA clearly indicates that it is intended to apply to determinations of eligibility, the clause plaintiffs rely on, "no income of the community spouse shall be deemed available to the institutionalized spouse" (42 U.S.C. §139r-5(b)(l)(2) (2000)), is clearly only in relation to determinations of eligibility. Additionally, for income in both spouses' names, half is "deemed" available to each spouse. 42 U.S.C. §1396r-5(b)(2)(A)(ii) (2000).

In Schweiker v. Gray Panthers, 453 U.S. 34, 44-45, 69 L. Ed. 2d 460, 470, 101 S. Ct. 2633, 2640-41 (1981), the United States Supreme Court addressed whether it was appropriate for Medicaid programs to "deem" income available between institutionalized and community spouses.

The Court concluded that the Secretary of Health and Human Services' definition of "available" was entitled to legislative effect, and that "deeming" is consistent with the statutory language, the legislative history, and Congress's subsequent amendments. See also 305 ILCS 5/10-1 (West 2004) ("It is the intent of this Code that the financial aid and social welfare services herein provided supplement rather than supplant the primary and continuing obligation of the family unit for self-support to the fullest extent permitted by the resources available to it").

Moreover, the Supreme Court has previously recognized the tension between "deeming" procedures, which grant authority in the Secretary to place requirements on the states, and the states' individual family responsibility laws. "We have no doubt that some tension exists between the Secretary's congressionally authorized power under subsection [1396a(a)](17)(B) to determine what income is 'available' to the applicant and Congress' intent in subsection (17)(D) to permit the States to enforce their spousal responsibility policies." Herweg v. Ray, 455 U.S. 265, 276-77, 71 L. Ed. 2d 137, 147, 102 S. Ct. 1059, 1067 (1982).

Section 1396a(a)(17), like the MCCA, is concerned only with eligibility. The loosening of eligibility requirements for institutionalized spouses did nothing to diminish the inherent tension between eligibility determinations and posteligibility recoupments. The MCCA changed the terms of section 1396a(a)(17) in only one crucial way: the state may not consider the income of a community spouse for determining the eligibility of an institutionalized spouse. The Herweg Court noted that the eligibility provisions of Medicaid law do not prohibit the state from seeking reimbursement under its family responsibility laws. See Herweg, 455 U.S. at 277 n.14, 71 L. Ed. 2d at 147 n.14, 102 S. Ct. at 1067 n.14.

The United States Supreme Court indicated that Medicaid eligibility provisions do not impact family responsibility laws, and when Congress amended those eligibility provisions, it was

silent on family responsibility. When statutes are enacted after judicial opinions are published, it is presumed that the legislature acted with knowledge of the prevailing case law. People v. Hickman, 163 Ill. 2d 250, 262, 644 N.E.2d 1147, 1153 (1994). Otherwise, Congress would have rejected the Court's interpretation and declared that family responsibility laws are expressly preempted by Medicaid eligibility requirements. Congress did not upset the settled interpretation that Medicaid eligibility provisions do not affect state family responsibility laws. However, it is inaccurate to say that Congress left section 1396a(a)(17) intact. For the limited purpose of determining Medicaid eligibility, Congress expressly superceded section 1396a(a)(17).

Furthermore, in light of the overarching goals of Medicaid and existing precedent at the time the MCCA was enacted, it becomes apparent that the seemingly definite language, "no income of the community spouse," was not meant as a barrier to spousal support. While the specific goal of Medicaid is to provide medical benefits for needy individuals, " 'from the beginning of the Medicaid program, Congress authorized States to presume spousal support.' " Wisconsin Department of Health & Family Services v. Blumer, 534 U.S. 473 , 479, 151 L. Ed. 2d 935, 944, 122 S. Ct. 962, 967 (2002), quoting Schweiker, 453 U.S. at 44, 69 L. Ed. 2d at 470, 101 S. Ct. at 2640 (also quoting the Congressional Record). According to the United States Supreme Court and the Congressional Record, the goal of the MCCA was to protect the community spouse from poverty, while protecting the Medicaid system from being abused by financially secure couples.

> "In the MCCA, Congress sought to protect community
> spouses from 'pauperization' while preventing financially secure
> couples from obtaining Medicaid assistance. See [H.R. Rep. No. 100-
> 105, pt. 2 at 65 (1987), reprinted in 1988 U.S.C.C.A.N. 857, 888]
> (bill seeks to 'end th[e] pauperization' of the community spouse 'by

assuring that the community spouse has a sufficient--but not excessive--amount of income and resources available')." Blumer, 534 U.S. at 480, 151 L. Ed. 2d at 944, 122 S. Ct. at 967.

Medicaid is not designed to supplant the traditional notions, enshrined in law and custom, that family members, particularly spouses and parents, have the responsibility to support their spouses and children.

"It thus is apparent that, from the beginning of the Medicaid program, Congress authorized States to presume spousal support. [Citation.]

The legislative history of this provision is fully consistent with its language. *** The Senate Report states in pertinent part:

'The committee believes it is proper to expect spouses to support each other and parents to be held accountable for the support of their minor children. . . . Such requirements for support may reasonably include the payment by such relative, if able, for medical care.'" Schweiker, 453 U.S. at 44-45, 69 L. Ed. 2d at 470, 101 S. Ct. at 2640-41, quoting S. Rep. No. 89-404, at 78 (1965), reprinted in 1965 U.S.C.C.A.N. 1943, 2018.

Although Medicaid is a state-administered federal program, to ensure the goals of the program are met, the federal government has imposed several requirements on states that choose to participate. Gillmore v. Department of Human Services, 354 Ill. App. 3d 497, 500, 822 N.E.2d 882, 885 (2004). First, Medicaid must be designed to be a "'payer of last resort.'" Arkansas Department

- 14 -

of Health & Human Services v. Ahlborn, 547 U.S. __, __, 164 L. Ed. 2d 459, 478, 126 S. Ct. 1752, 1767 (2006), quoting S. Rep. No. 99-146, at 313 (1985), reprinted in 1986 U.S.C.C.A.N. 42, 279. Therefore, states must "take all reasonable measures to ascertain the legal liability of third parties \*\*\* to pay for care and services available under the plan." 42 U.S.C. §1396a(a)(25)(A) (2000). This is the basis of seeking reimbursement for Medicaid expenses from, for example, absent parents.

Second, as a condition of participation in Medicaid, participants must sign over their rights to support to the state. 42 U.S.C. §1396k(a)(1)(A) (2000). Thus, once a person chooses to participate in Medicaid, the state uses this right to support to pursue responsible third parties for reimbursement. In Illinois, the Department of Healthcare and Family Services (formerly Department of Public Aid) is charged with the responsibility of pursuing payments for child or spousal support. 305 ILCS 5/10-1, 10-2 (West 2004).

Third, the MCCA requires that the community spouse be provided a minimum allowance of assets and income in the event that all, or most, of the assets and income are in the name of the institutionalized spouse. 42 U.S.C. §1396r-5(d) (2000). This provision was specifically enacted to prevent a situation where all of the couple's income and assets would be "deemed" available to the institutionalized spouse, leaving the community spouse with nothing. See Blumer, 534 U.S. at 480, 151 L. Ed. 2d at 944, 122 S. Ct. at 967, noting H.R. Rep. No. 100-105, pt. 2, at 66-67 (1987) (Conf. Rep.), reprinted in 1988 U.S.C.C.A.N. 857, 889-90. In Blumer, the Court dealt with the specific provision of the MCCA pertaining to determining how to calculate a married couple's resources for purposes of determining the community-spouse resource allowance (CSRA). The dispute revolved around whether the CSRA should be calculated by taking into account only the community spouse's income alone--the "income-first" method--or after taking into consideration the contribution, if any, to the community spouse made from the income of the institutionalized spouse--

- 15 -

the "resource-first" method. The Court in Blumer held that states could choose between two methods of calculation when determining the minimum allowances of assets mandated by the MCCA. The Court noted that the MCCA allows states wide latitude when applying certain provisions of the MCCA and deferred to the Secretary's opinion that either method was an appropriate way for states to determine the CSRA.

The House Conference Report when enacting the MCCA provides further evidence that Congress was aware of existing state laws regarding spousal support at the time and did not intend for the MCCA to supercede these laws. The House report indicates that the House was aware that some states implemented their own spousal-contribution requirements in addition to the provisions of the Act. "However, some [s]tates do impose spousal contribution requirements in these circumstances." H.R. Rep. 100-105, pt. 2, at 66 (1987), reprinted in 1988 U.S.C.C.A.N. 857, 889.

The Department of Health and Human Services (HHS) is an additional source of guidance for interpreting Medicaid law. HHS oversees Medicaid law, and the United States Supreme Court has made it clear that an agency's interpretation of its own regulations deserves deference from the courts, especially when the area is technically complex.

> "We must give substantial deference to an agency's interpretation of its own regulations. [Citations.] Our task is not to decide which among several competing interpretations best serves the regulatory purpose. *** This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.' [Citation.]"

Thomas Jefferson University v. Shalala, 512 U.S. 504, 512, 129 L. Ed. 2d 405, 415, 114 S. Ct. 2381, 2386-87 (1994).

The State Medicaid Manual, produced by the Centers for Medicare and Medicaid Services (CMMS) (formerly known as the Health Care Financing Administration), which has been delegated authority over Medicaid by the Secretary of Health and Human Services, provides important interpretation of Medicaid law to help states interpret the myriad provisions of federal law applicable to states.

> "We note that a guideline such as [the State Medicaid Manual], although not a statute or regulation, is entitled to deference by the courts as long as it is 'consistent with the plain language and purposes of the statute and if [it is] consistent with prior administrative views.' [Citation.]" Gillmore, 354 Ill. App. 3d at 501, 822 N.E.2d at 886.

"It is an official medium by which the [CMMS] issues mandatory, advisory, and optional Medicaid policies and procedures to the Medicaid State agencies." CMMS State Medicaid Manual Pub. 45-1. With respect to whether states can pursue support payments from community spouses, the State Medicaid Manual states that it is a matter of state law whether states can pursue community spouses.

> "Assigned Support Rights--Pending publication of regulations a reasonable definition is: An assignment of a support right allowing you to go against community spouses for reimbursement of some or all of the medical care provided to institutional spouses. You [the states] must assess your own State laws to determine what laws give rise to support rights and the amount of medical costs community

- 17 -

spouses are asked to cover and whether you are limited to seeking support in the amount community spouses' resources exceed spousal allowances." CMMS State Medicaid Manual Pub. 45-3 §3260.1.

The CMMS manual makes it clear that the Secretary believes that the MCCA does not preempt state law. As discussed above, the courts have often deferred to the Secretary's opinion regarding the implementation of Medicaid statutes.

Finally, we look to other states' precedents in determining whether federal law preempts Illinois law. New York, for example, uses a program very similar to Illinois's to pursue income contributions from community spouses. Under New York law, the community spouse may simply refuse to contribute to the medical costs of the institutionalized spouse; however, the State can then recoup the costs from the community spouse that have been paid out by Medicaid for the institutionalized spouse's care. See 52A N.Y. Soc. Serv. Law §366(3)(a) (McKinney 2006); In re Shah, 95 N.Y.2d 148, 733 N.E.2d 1093 (2000); Commissioner of Department of Social Services v. Spellman, 173 Misc. 2d 979 (N.Y. 1997).

> "[T]he exercise of this right of 'spousal refusal' does not deprive the State of all opportunity to seek recoupment from a financially qualified community spouse. It just requires a reimbursement process to obtain resources from the community spouse after Medicaid benefits are paid, instead of an initial calculation stage that might limit the amount of Medicaid benefits to be provided." Shah, 95 N.Y.2d at 162, 733 N.E.2d at 1101.

In Connecticut, the federal district court characterized a similar provision that allowed

- 18 -

the institutionalized spouse to assign his support rights to the state and then the community spouse to refuse to contribute as creating a "pay and chase" system, whereby the state cannot refuse Medicaid eligibility based on the couple's resources but then must seek contribution from the community spouse. Morenz v. Wilson-Coker, 321 F. Supp. 2d 398, 403, 407 (D. Conn. 2004) (holding that, although allowing a community spouse to refuse to contribute created a myriad of problems, including wasting scarce state resources pursuing reimbursement, the language of both the MCCA and Connecticut state law allowed such spousal refusal), aff'd by Morenz v. Wilson-Coker, 415 F.3d 230 (2d Cir. 2005). The Connecticut Attorney General also issued an opinion considering the legality of pursuing support from community spouses, concluding that it was legal so long as the law did not encroach on the minimum allowances prescribed by federal law for the community spouse. 1992 Op. Conn. Att'y Gen. 92-015 (1992) ("Given this historical perspective, MCCA's prohibition against the deeming of income availability to an institutionalized spouse does not affect a state's authority to pursue recovery from community spouses not receiving a CSRA").

These cases have interpreted section 1396r-5(c)(3), which says, "The institutionalized spouse shall not be ineligible by reason of resources *** where *** the institutionalized spouse has assigned to the State any rights to support from the community spouse" (42 U.S.C. §1396r-5(c)(3) (2000)) as permitting a state right of spousal refusal. In each of these cases, a community spouse had resources above the limits allowed by the MCCA and simply refused to allow any resources to be used for the care of their spouse, as provided by state law. However, in each case, the courts found that it was permissible for the state to then pursue the community spouse for reimbursement under their state laws, which are similar to the Illinois laws at issue here.

The MCCA can be read in harmony with other Medicaid and state-law provisions

calling for family responsibility. Such a reading is consistent with the dual purposes of the MCCA--protecting community spouses from 'pauperization' while preventing financially secure couples from obtaining welfare assistance. Such a reading is also consistent with the overall purpose of Medicaid--to provide for the needy and supplement but not supplant family responsibility.

We share the dissent's concern that this court must interpret statutes as written and leave questions of policy to be addressed by Congress. That is why in discerning whether preemption exists, we must look to Congress's intent. Valstad, 357 Ill. App.3d at 922, 828 N.E.2d at 872. Courts must begin with the presumption that Congress did not intend to displace state law. Valstad, 357 Ill. App.3d at 922, 828 N.E.2d at 872. Then, the court must examine the federal law to determine whether the state law is expressly or impliedly preempted, or whether the state law directly conflicts with federal law. Valstad, 357 Ill. App. 3d at 922, 828 N.E.2d at 872. In this instance, Congress neither explicitly or impliedly preempted Illinois law, and Illinois law does not frustrate the execution of federal law. Therefore, this court must reverse the trial court's finding because Illinois law regarding family responsibility is not preempted by the MCCA.

## III. CONCLUSION

Therefore, for the reasons above, we reverse the trial court's judgment.

Reversed.

TURNER, J., concurs.

KNECHT, J., dissents.

- 20 -

JUSTICE KNECHT, dissenting:

I would affirm because the trial court was correct in concluding the spousal-support provisions of article X of the Public Aid Code were preempted by the MCCA.

Congress's desire to preempt State law may be shown expressly, by implication, or through a conflict between federal and state law. Busch, 169 Ill. 2d at 335, 662 N.E.2d at 403. The United States Supreme Court has recognized:

> "[A] federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively [citation], or when state law is in actual conflict with federal law. We have found implied conflict pre[]emption where it is 'impossible for a private party to comply with both state and federal requirements,' [citation], or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citation.]" Freightliner Corp. v. Myrick, 514 U.S. 280, 287, 131 L. Ed. 2d 385, 392, 115 S. Ct. 1483, 1487 (1995).

In this case, the state law requiring a community spouse to use his or her income to support his or her institutionalized spouse in a long-term-care facility "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" exhibited by the MCCA to protect the income of a community spouse from being required for the support of his or her institutionalized spouse in a long-term-care facility.

I agree with the trial court: the MCCA restricts the State from seeking support from

- 21 -

the income of a community spouse, even if his or her income is more than the monthly needs allowance, for his or her "institutionalized spouse" receiving Medicaid.

The State argues this is against the public policy because financially secure individuals with high incomes might never have to contribute any of their income to their "institutionalized spouse's" care. This is a question of policy. We are charged with interpreting a statute as it is written. If some limited number of community spouses take advantage of this policy, then Congress can change the statute to avoid this result.