NO. 4-09-0512    Filed 9/10/10

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE McKINLEY FOUNDATION AT THE UNIVERSITY OF ILLINOIS, an Illinois Not-for-Profit Corporation, | ) ) ) | Appeal from Circuit Court of Champaign County |
|      Plaintiff-Appellee, | ) | No. 08MR688 |
|      v. | ) | |
| THE ILLINOIS DEPARTMENT OF LABOR, and CATHERINE SHANNON, Director of the Illinois Department of Labor, | ) ) ) | |
|      Defendants-Appellants, | ) | |
|      and | ) | |
| STEVENS CONSTRUCTION CORPORATION; A&B DRYWALL; CHRIS GREEN, INC.; LOCH ACOUSTIC; ELECTRI-TEC; and UNKNOWN SUBCONTRATORS, | ) ) ) ) | Honorable Michael Q. Jones, |
|      Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE POPE delivered the opinion of the court:

In April 2009, plaintiff, the McKinley Foundation at the University of Illinois (McKinley), filed a motion for summary judgment against defendants the Illinois Department of Labor (Department) and its Director, Catherine Shannon (herein referred to collectively as the Department), seeking an order that the Prevailing Wage Act (Act) (820 ILCS 130/1 through 12 (West 2008)) is inapplicable to its construction project because McKinley is not a "public body" for purposes of the Act. That same month, defendant Stevens Construction Corporation (Stevens), the construction company hired by McKinley to complete its project, also moved for summary judgment on the same ground as McKinley or, alternatively, if McKinley was a "public body," for damages on the ground that McKinley failed to give Stevens notice it

would have to pay its employees the prevailing wage rate. Stevens's subcontractors, defendants A&B Drywall; Chris Green, Inc.; and Electri-Tec, joined in Stevens's motion. Following a May 2009 hearing, the circuit court granted summary judgment in favor of McKinley, Stevens, and the subcontractors.

The Department appeals, arguing the circuit court erred in granting McKinley's and Stevens's motions for summary judgment because McKinley constitutes a "public body" for purposes of the Act since it financed its project with tax-exempt bonds issued under the Illinois Finance Authority Act (20 ILCS 3501/801-1 et seq. (West 2008)). We agree and reverse.

I. BACKGROUND

A. Factual Background

McKinley is a not-for-profit corporation functioning as a Presbyterian ministry for college students. In June 2007, McKinley contracted with Stevens to construct student housing and parking on its property located at 405 East John Street in Champaign.

Although private donations fund McKinley, financing for its construction project, in part, stemmed from tax-free bonds issued through the Illinois Finance Authority (Authority). The bonds were sold to private investors and backed by a letter of credit from Keybank, N.A., which paid the investors and then received reimbursement from McKinley. In the event of a default, Keybank's sole recourse would have been against McKinley, and the private investors' sole recourse would have been against KeyBank.

- 2 -

At no point would the State of Illinois be obligated or liable on the bonds. The only connection between the State and McKinley was that McKinley paid the Authority a fee for acting as the accommodator for the bonds' issuance.

In April 2008, a Department conciliator wrote McKinley, requesting information concerning the construction project to evaluate its conformance with the Act, which, in certain circumstances, requires contractors pay workers employed on public-works construction projects a minimum hourly wage based on pay for work of a similar character in the county where the work is performed. In written correspondence between the Department and McKinley's counsel, McKinley acknowledged the project was a "public work" pursuant to the Act but denied being a "traditional public body" or "an institution supported in whole or [in] part by public funds." McKinley maintained both factors must exist to trigger application of the Act. The Department disagreed. In a letter to McKinley, the Department's chief legal counsel noted as follows:

> "[I]t is the opinion of [the Department] that because the fixed[-]work construction is a 'public work,' as explicitly defined in the Act, [McKinley] is, for purposes of that fixed[-]work construction, a 'public body[]' within the meaning of the Act. Accordingly, as provided in [s]ection 3 of the Act, all laborers, workers[,] and mechanics employed

- 3 -

by or on behalf of [McKinley] engaged in the construction of that public work must be paid the prevailing wage."  (Emphasis in original.)

In August 2008, after receiving payroll forms from Stevens and several subcontractors, the Department (1) informed them "certain employees were paid less than the prevailing rate of wage," (2) ordered them to pay the total difference in wages, and (3) assessed penalties amounting to 20% of the total underpayment.

## B. Procedural History

The following month, McKinley filed a complaint naming the Department, Director Shannon, Stevens, several subcontractors, and "unknown subcontractors" as defendants.  The complaint sought declaratory judgment that the Act was inapplicable to its construction project, which would thereby eliminate the obligation of Stevens and the subcontractors to pay their employees the prevailing wage rate.  In response, Stevens filed an answer, a counterclaim against McKinley, and a cross-claim against the Department and Director Shannon, requesting, inter alia, (1) a declaratory judgment stating the project fell outside of the Act's scope or, alternatively, (2) damages from McKinley in the event the project fell under the Act's purview because McKinley failed to give Stevens and the subcontractors notice they would have to pay their employees the prevailing wage rate.  Stevens's subcontractors filed various cross-claims and

- 4 -

answers containing affirmative defenses, none of which are pertinent to this appeal.

In October 2008, the Department filed a motion to dismiss McKinley's and Stevens's complaints pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2008)), but the circuit court denied both motions. The Department then filed counterclaims against Stevens and several subcontractors, seeking underpaid wages, statutory penalties, and punitive damages. Stevens filed an answer, and the subcontractors filed answers containing various counterclaims against Stevens and affirmative defenses to the Department's complaint.

In April 2009, McKinley filed a motion for summary judgment, alleging that although its construction project fell within the Act's definition of "public work," McKinley is not a "public body" and thus the Act is inapplicable to its project. To its motion, McKinley attached an affidavit from its executive director, Reverend Heidi Weatherford, stating McKinley is (1) a 501(c)(3) tax-exempt foundation; (2) supported entirely by private funds; and (3) not supported in any way by public funds, including those from federal or state governments. The affidavit further stated McKinley's project was partly financed by tax-free bonds issued by the Authority but that McKinley paid a fee to the Authority in exchange for issuance of the bonds and, in the event of a default, the state would never be liable or obligated on the bonds. Stevens filed a summary-judgment motion, which also

alleged the Act was inapplicable to McKinley's construction project because McKinley was not a "public body."

In May 2009, after hearing arguments on both motions, the circuit court granted summary judgment in favor of McKinley and Stevens and dismissed all counterclaims and cross-claims. During the hearing, the court reasoned as follows:

"[T]he definition of [']public body['] does not say the State or any subdivision or an institution supported in whole or in part by public funds or an institution [that] has a project financed by the [Authority].  [The legislature] saw fit to include that language to define what a public work is.  They apparently did not see fit to include that language in defining what a public body is.  If this is an oversight of theirs, then they have to correct it.  I'm not going to speculate one way or another.  I will just say I'm going to read what was written and not read what wasn't written.

The plain meaning of this Act is what McKinley and Stevens suggest to this [c]ourt that it is.  There is a two-pronged test. Not all public works are carried out by public bodies.  Therefore, they suggest that for the *** Act to apply[,] a public works

[project] must be carried out by a public body and they tell me in black and white what a public body is. And from the [a]ffidavit of Ms. Weatherford, they clearly are not a public body."

In June 2009, the Department and Director Shannon timely filed notice of appeal. In December 2009, over McKinley's and Stevens's objection, this court allowed a motion from the Indiana, Illinois, Iowa Foundation for Fair Contracting (Foundation), a not-for-profit labor-management corporation committee, for leave to file an amicus curiae brief in support of the Department and Director Shannon. The Foundation filed its amicus brief later that same month.

## II. ANALYSIS

On appeal, the Department contends the circuit court erred in granting summary judgment in favor of McKinley and Stevens because both McKinley and its construction project fall within the Act's scope. Specifically, the Department alleges because McKinley's construction project received partial financing from Authority bonds, the project is a public work, thereby indicating McKinley is a public body for purposes of this particular project. McKinley and Stevens counter that while the project was partially financed by Authority bonds and thus constitutes a public work, McKinley is not a public body because it received no public funding and therefore the Act is inapplicable.

"Summary judgment is appropriate where the pleadings, depositions, admissions[,] and affidavits on file, viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co., 227 Ill. 2d 102, 106, 879 N.E.2d 305, 308 (2007).  We review the circuit court's decision to grant summary judgment de novo. Stern v. Wheaton-Warrenville Community Unit School District 200, 233 Ill. 2d 396, 404, 910 N.E.2d 85, 91 (2009).  A de novo standard of review is also proper when the issue on appeal involves a matter of statutory construction (In re Estate of Ellis, 236 Ill. 2d 45, 50, 923 N.E.2d 237, 240 (2009)) or the constitutionality of a statute (People v. Johnson, 225 Ill. 2d 573, 584, 870 N.E.2d 415, 421 (2007)).

## A. Forfeiture

As a threshold matter, we address McKinley's position the Department forfeited arguments raised in its brief by not raising them before the circuit court.  Specifically, McKinley alleges the arguments set forth in the Department's brief pertaining to (1) the ambiguity of the Act, (2) whether financing through the Authority can exist without compliance with the Act, and (3) whether a "public work" makes a private entity a "public body" are "inconsistent with the arguments that were presented in [the Department's] briefs and oral argument in the trial court."

Issues not raised before the trial court are considered

forfeited, and a party may not raise such issues for the first time on appeal.  Vine Street Clinic v. HealthLink, Inc., 222 Ill. 2d 276, 300-01, 856 N.E.2d 422, 438 (2006).

Regarding McKinley's argument the Department forfeited any argument concerning whether a "public work" makes a private entity a "public body" for purposes of the Act, the record before us on appeal establishes both parties continuously raised this issue before the circuit court--in oral argument and in written memoranda--and therefore no reason exists to deem it forfeited.

### B. The Act's Plain Language

In the case at bar, the parties dispute no material facts, and thus the issue on appeal is one of statutory interpretation.  Specifically, this court must determine whether a private entity that avails itself of financing with Authority bonds is required to pay prevailing wages pursuant to the Act.

The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent.  People v. Diggins, 235 Ill. 2d 48, 54, 919 N.E.2d 327, 331 (2009).  "The best indicator of the legislature's intent is the language of the statute, which must be accorded its plain and ordinary meaning."  Diggins, 235 Ill. 2d at 54, 919 N.E.2d at 331.  To avoid rendering any part of the statute meaningless or superfluous, statutes are construed in their entirety.  Weather-Tite, Inc. v. University of St. Francis, 233 Ill. 2d 385, 389-90, 909 N.E.2d 830, 833 (2009).  Where the statutory language is clear and unambiguous, a court must apply the statute as written without

- 9 -

resorting to aids of statutory construction. <u>Solon v. Midwest Medical Records Ass'n, Inc.</u>, 236 Ill. 2d 433, 440, 925 N.E.2d 1113, 1117 (2010).

Section 1 of the Act states its purpose as follows:

"It is the policy of the State of Illinois that a wage of no less than the general prevailing hourly rate as paid for work of a similar character in the locality in which the work is performed, shall be paid to all laborers, workers[,] and mechanics <u>employed</u> <u>by</u> <u>or</u> <u>on</u> <u>behalf</u> <u>of</u> <u>any</u> <u>and</u> <u>all</u> <u>public</u> <u>bodies</u> engaged in public works."

(Emphasis added.) 820 ILCS 130/1 (West 2008). Accordingly, the Act's policy ensures people employed by or on behalf of public bodies engaged in public works are paid the prevailing wage in their locale. The Act was not meant to dictate what private employers paid their employees. See <u>Town of Normal v. Hafner</u>, 395 Ill. App. 3d 589, 597, 918 N.E.2d 1268, 1274 (2009) ("the purpose of the Act is to ensure laborers on public projects are paid the prevailing wage, not to interfere with economic development by private companies"); see also 820 ILCS 130/3 (West 2008) ("Not less than the general prevailing [wage] *** shall be paid to all laborers *** employed by or on behalf of <u>any</u> <u>public</u> <u>body</u> engaged in the construction of public works" (emphasis added)).

Section 3 of the Act, in pertinent part, requires as

- 10 -

follows:

> "Not less than the general prevailing
> rate of hourly wages for work of a similar
> character on public works in the locality in
> which the work is performed, and not less
> than the general prevailing rate of hourly
> wages for legal holiday and overtime work,
> shall be paid to all laborers, workers[,] and
> mechanics employed by or on behalf of <u>any</u>
> <u>public body engaged in the construction of</u>
> <u>public works</u>." (Emphasis added.) 820 ILCS
> 130/3 (West 2008).

Section 2 sets out the scope of the Act, stating "[t]his Act applies to the wages of laborers, mechanics[,] and other workers employed in any public works *** by any public body and to anyone under contracts for public works." 820 ILCS 130/2 (West 2008). Section 2 defines "public works" to mean "all fixed works constructed by any public body" and further provides:

> "'Public works' as defined herein includes
> all projects financed in whole or in part
> with bonds issued under *** the Illinois
> Finance Authority Act ***." 820 ILCS 130/2
> (West 2008).

Thus, under the Act, a public work is defined as a fixed work constructed by any public body, and that definition <u>includes</u> projects financed in whole or in part with Authority

- 11 -

bonds. Since all parties agree this project was a "public work," and by definition a public work is a fixed work constructed by a public body (which includes projects financed with Authority bonds), the Department contends projects financed with Authority bonds are governed by the Act. This is not an unreasonable interpretation of the Act.

McKinley concedes its 405 John Street construction project is a public work but contends it is not a "public body" within the definition of the Act. The Department maintains that, for purposes of the project, McKinley is a public body solely because it performed a public work financed through Authority bonds.

The definition of "public works" includes projects financed with bonds issued under certain enumerated statutes, including, as noted above, the Illinois Finance Authority Act (20 ILCS 3501/801-1 through 999-99 (West 2008)). If any entity that avails itself of financing under one of the specifically enumerated financing acts is considered a public body, then McKinley is clearly a public body. This is the Department's position.

McKinley's position is that the specifically enumerated financing acts merely define "public works" and have no relation to "public body." Many of the enumerated financing acts, like the Illinois Finance Authority Act, do not use public monies to fund construction projects. By including these acts in the definition of "public works," the legislature made clear that if

the _financing_ of a project is accomplished pursuant to an enumerated statute, like the Illinois Finance Authority Act, the project is considered a public work, even if no public _funds_ are actually expended on the project.  A project paid for wholly or in part out of public funds is a "public work," but so is any project financed under any of the enumerated statutes.  Thus, the legislature expanded public works beyond those "paid for wholly or in part with public funds" to include those financed with conduit financing pursuant to the specifically enumerated statutes.  However, the legislature made no similar expansion to the definition of "public body."  Therefore, a "public body" remains any institution supported in whole or in part by public _funds_.  McKinley's interpretation of the statute is not unreasonable.

Further, McKinley contends, the Department's interpretation would render the Act's requirement that the construction be accomplished by a "public body" mere surplusage. The Department, however, answers that the term "public body" is not surplusage because it still has relevance when one of the enumerated financing statutes is not involved in the project. The trial court pointed out the legislature demonstrated its ability to expand the definition of "public works" to include projects such as McKinley's construction project.  However, it failed to expand the definition of "public body" to include private institutions that avail themselves of financing under the enumerated statutes.  While the court recognized this may have

- 13 -

been a legislative oversight, it felt compelled not to speculate but, rather, applied the statute as written. Since the Act requires both a public work and a public body and because McKinley is not supported in whole or in part with public funds, the court found the Act did not apply to the project. As noted above, the McKinley position, adopted by the trial court, is not an unreasonable reading of the Act.

Where there are two reasonable interpretations of a statute, we will look to the legislative history for guidance in order to discern the legislature's intent. Poindexter v. State of Illinois, 372 Ill. App. 3d 1021, 1028, 869 N.E.2d 139, 146 (2006). Effective January 1, 1990, the General Assembly amended section 2 of the Act to include in the definition of "public works" projects financed with bonds issued under various financing acts, including the Illinois Finance Authority Act (formerly the Illinois Development Finance Authority Act). See Pub. Act 86-799, §1, eff. January 1, 1990 (1989 Ill. Laws 4208, 4208). During the Senate debates on House Bill 568, Senator Hudson, who was opposed to the bill, stated as follows:

> "Local governments--what the amendments do,
> Ladies and Gentlemen, the bill requires that
> the prevailing wage be paid on all projects
> financed in whole or part with bonds issued
> under the--municipal--under the--were bonds
> issued under Division 74 of the Municipal
> Code. More to the point, local governments

- 14 -

here--this would affect local governments. DCCA is opposed to it, because local governments are already required to pay prevailing wages when they contract for public works, regardless of the funding source--bonds, IDFA Funds, or Build Illinois Funds. This bill is apparently designed to expand the prevailing wage cover to all Illinois projects, including projects involving loans to business." 86th Ill. Gen. Assem., Senate Proceedings, June 13, 1989, at 81 (statements of Senator Hudson).

On June 19, 1989, debate continued on a Senate amendment to House Bill 568. Senator Hudson explained the amendment as follows:

"And what that amendment does is to-- drastically expand the definition of public works, so that prevailing wage must now be paid for projects that were not previously included. For example, those projects that fall under the Build Illinois Bond Act and others." (Emphasis added.) 86th Ill. Gen. Assem., Senate Proceedings, June 19, 1989, at 94-95 (statements of Senator Hudson).

When the bill, as amended, returned to the House for further consideration, Representative Didrickson spoke in opposition.

"If you can't see yourself to vote against prevailing wage, at least vote against this Bill because it expands it into the Build Illinois projects. It's the wrong direction. Instead of doing what other states are doing in terms of retrenching on this issue, we're going forward and expanding it. A 'no' vote is the only vote on this issue." 86th Ill. Gen. Assem., House Proceedings, June 27, 1989, at 21 (statements of Representative Didrickson).

Representative Black, in opposition to the bill, stated as follows:

"Many of us go to the Development Finance Authority Act or the Industrial Building Revenue Act or Build Illinois and we ask for assistance in various capital projects in our district. Now, be that a Sears and Roebuck package or ... in the case of some of the rest of us, a small to medium sized industry that needs maybe a 10 percent financing incentive to build a plant in our district. And now, if I understand what we're doing here, if any amount of money is put in through the various state bonding Acts is used, 5 percent or 10 percent or whatever, it

makes what could be a private development subjected to the Prevailing Wage Act. I come from a border district and I see time after time after time that we're not competitive with the State of Indiana. All I would submit to you is that I'm not certain that this Senate Amendment is in the best interest of trying to build the economic base of the State of Illinois and I simply rise in opposition to the concurrence Motion." 86th Ill. Gen. Assem., House Proceedings, June 27, 1989, at 24-25 (statements of Representative Black).

Despite the strong debate in opposition to the expansion of the Act, the measure became law. The legislative history makes clear the General Assembly intended to expand the coverage of the Act to projects constructed by entities benefitting from financing under an enumerated public-financing mechanism, even if the entity itself was not a traditional public body. Thus, we find the housing project, financed in part with bonds issued by the Authority, is covered by the Act and required payment of prevailing wages.

## D. Constitutional Concerns

Finally, McKinley argues applying the Act to construction projects financed through Authority bonds but conducted by private entities violates the United States and

Illinois Constitutions' (1) equal-protection clauses and (2) establishment clauses.  We disagree.

## 1. Equal Protection

McKinley first contends applying the Act "to all public works projects, regardless of whether carried out by a public body or private entity, violates the equal protection clauses of the [f]ederal and Illinois constitutions."

A statute is unconstitutional if it impermissibly restricts a person's life, liberty, or property interest.  U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2.  Where the challenged statute does not affect a fundamental right, the rational-basis test applies.  Davis v. Brown, 221 Ill. 2d 435, 450, 851 N.E.2d 1198, 1208 (2006).  Under the rational-basis test, a court determines (1) whether a legitimate state interest supports the legislation and, if so, (2) whether a reasonable relationship exists between that interest and the means the legislature has chosen to pursue it. See Lebron v. Gottlieb Memorial Hospital, 237 Ill. 2d 217, 238-39, ___ N.E.2d ___, ___ (2010).  Every statute enjoys a strong presumption of constitutionality, and the party challenging the statute bears the burden of rebutting this presumption.  In re Marriage of Miller, 227 Ill. 2d 185, 195, 879 N.E.2d 292, 298-99 (2007).

Here, the purpose of the Act is to ensure (1) workers involved with public-works projects receive a decent wage, (2) public-works projects are performed efficiently, and (3) local workers' jobs are protected by removing the incentive to import

- 18 -

less-expensive labor from areas outside the locality in which the work is being performed.  People ex rel. Bernardi v. City of Highland Park, 121 Ill. 2d 1, 10, 520 N.E.2d 316, 320 (1988). The General Assembly's inclusion of projects financed with Authority bonds as "public works" for purposes of the Act rationally relates to these purposes.  In upholding the Act against previous equal-protection challenges, the supreme court noted as follows:

> "'"[The Act] belongs to the state, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of the municipalities."'"  People ex rel. Bernardi v. Roofing Systems, Inc., 101 Ill. 2d 424, 427, 463 N.E.2d 123, 124 (1984), quoting Hayen v. County of Ogle, 101 Ill. 2d 413, 422, 463 N.E.2d 124, 128 (1984), quoting Atkins v. Kansas, 191 U.S. 207, 222-23, 48 L. Ed. 148, 158, 24 S. Ct. 124, 127 (1903).

As the Department indicates in its reply brief, "[i]f an otherwise private entity elects to take advantage of state-issued tax-free bonds, rather than seeking financing in the private market, then it is rational to require [it] to pay the prevailing wage to workers on that project."

McKinley cites City of Monmouth v. Lorenz, 30 Ill. 2d

- 19 -

60, 65-67, 195 N.E.2d 661, 664-65 (1963), for the proposition that placing public bodies and private construction contractors into a single class is improper, given the distinctions between employment relations existing among employers of private contractors and public employees. In City of Monmouth, the supreme court held amendments to the Act violated equal protection because the amendments required both public bodies and private contractors to pay their employees at the same rate despite the fact year-round government workers received higher compensation than seasonal, private-market employees. City of Monmouth, 30 Ill. 2d at 66-67, 195 N.E.2d at 664-65. The court noted "the two classes of employers are by their very nature in such a position that they cannot and do not confer similar economic benefits on their employees exclusive of the rate of pay." City of Monmouth, 30 Ill. 2d at 66-67, 195 N.E.2d at 664-65. However, in this case, McKinley is not simply a private employer for purposes of the Act. As stated above, because McKinley opted to use Authority bonds to partially finance its construction project, McKinley brought itself within the parameters of the Act. McKinley chose to avail itself to the Act's requirements rather than privately funding its project and thus cannot set forth the arguments presented by the parties in City of Monmouth.

We find the Act rationally relates to the state's legitimate interest in protecting its workforce engaged in public-works projects. The Act "both mitigates against an

- 20 -

impoverished work force and 'support[s] the integrity of the collective[-]bargaining process by preventing the undercutting of employee wages in the private construction sector.' [Citation.]" City of Highland Park, 121 Ill. 2d at 14, 520 N.E.2d at 322. "Establishing minimum requirements to attain those goals and to otherwise improve working conditions has traditionally been a matter of [s]tate concern." City of Highland Park, 121 Ill. 2d at 14, 520 N.E.2d at 322. Consequently, we reject McKinley's contention the Act violates equal protection.

### 2. Establishment

Next, McKinley, given its religious affiliation, argues the Act violates the establishment clause of the United States Constitution (U.S. Const., amend. I) and article 10, section 3, of the Illinois Constitution (Ill. Const., art. X, §3).

"The establishment clause of the first amendment (U.S. Const., amend. I) prohibits state and federal action 'favoring the tenets or adherents of any religion or of religion over nonreligion.' [Citations.]" People v. Falbe, 189 Ill. 2d 635, 645, 727 N.E.2d 200, 207 (2000). In Illinois, our state constitution provides in pertinent part that "[n]o person shall be required to attend or support any ministry or place of worship against his consent, nor shall any preference be given by law to any religious denomination or mode of worship." Ill. Const. 1970, art. I, §3. To pass constitutional scrutiny, a statute must satisfy the following: "[(1)] [its] legislative purpose must be secular, [(2)] its principal or primary effect cannot advance

or inhibit religion, and [(3)] it must not foster an excessive governmental entanglement with religion." Falbe, 189 Ill. 2d at 646, 727 N.E.2d at 207.

McKinley alleges that if it is a "public body" under the Act, it is also supported by "public funds," which would violate the establishment clause. However, whether an entity is a public body under the Act does not control whether it constitutes a public body under other statutes. See People ex rel. Bernardi v.Illini Community Hospital, 163 Ill. App. 3d 987, 990, 516 N.E.2d 1320, 1321 (1987). Accordingly, whether an entity is a public body or a private, religious foundation under the Act is irrelevant as to that entity's identity for purposes of the first amendment or the Illinois Constitution.

Moreover, assuming arguendo that McKinley's receipt of Authority bonds falls under the purview of the establishment clause, McKinley sets forth no argument as to how such funding advances or inhibits religion or fosters excessive government entanglement with religion. "[A] point raised but not argued or supported by citation to relevant authority fails to satisfy the requirements of Supreme Court Rule 341[(h)](7) [(210 Ill. 2d R. 341(h)(7); see also 210 Ill. 2d R. 341(i) (applying requirements placed on appellants' briefs to those of appellees))] and is therefore [forfeited]." People v. Patterson, 154 Ill. 2d 414, 454-55, 610 N.E.2d 16, 34 (1992). Because McKinley forfeited these arguments, we need not address them on appeal.

III. CONCLUSION

For the reasons stated, we reverse the trial court's grant of summary judgment.

Reversed and remanded for further proceedings.

TURNER, J., concurs.

STEIGMANN, J., specially concurs.

JUSTICE STEIGMANN, specially concurring:

This is a difficult case involving a problem of statutory construction that has arisen because the Act is poorly written. The majority does a good job of explaining how two reasonable interpretations of the Act could be made and then adopting the one it concluded is more persuasive. Although in my view this is a close case, I concur with that conclusion. I write specially because I disagree with the majority's consideration of--much less reliance upon--"legislative history" when it is based upon the remarks of individual legislators.

I reaffirm what I wrote for this court 18 years ago:

"[L]egislators do not make laws by making speeches on the floor of the legislative chamber or by writing memos for committee meetings. They make laws by majority vote on a specifically worded bill that has been read three times before each house and distributed to each legislator. (Ill. Const. 1970, art. IV, §§8(c), (d).) Neither the disclosed nor undisclosed intent of a legislator or lobbyist becomes <u>law</u>; only the bill as it reads when passed becomes law." (Emphasis in original.) <u>Town of the City of Bloomington v. Bloomington Township</u>, 233 Ill. App. 3d 724, 736, 599 N.E.2d 62, 70 (1992).

In my view, for the reasons stated by Justice Scalia,

"legislative history," commonly understood (as in this case) as the remarks of one or more legislators on the floor of the House or Senate, has no value whatsoever. "The greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators." Conroy v. Aniskoff, 507 U.S. 511, 519 123 L. Ed. 2d 229, 238, 113 S. Ct. 1562, 1567 (1993) (Scalia, J., concurring).

The Illinois House of Representatives has 118 members and the Illinois State Senate has 59. At the third reading of a specific bill in a given chamber, the members of that chamber vote yes or no (or present, if they wish) on that bill as it is proposed in its written form. A given state senator might read a particular bill in one way, while another state senator might interpret it differently. Although some senators might choose to take to the senate floor to announce their particular interpretations of the bill, the problems they hope it will address, or why they believe it should be enacted, experience demonstrates that at any given time on third reading in any legislative chamber, a large percentage of the members of that chamber are paying little attention, if any, to the remarks of their colleagues. They might be consulting among themselves about other legislative or political matters, speaking on the phone, working on their computers, or simply daydreaming. But by engaging in any of these activities, they are not delegating to their colleagues who choose to speak about the bill the authority to define what it means. Instead, the senators who choose not to

speak on the bill are entirely justified in relying upon the words it contains, not the remarks of their colleagues construing those words in whatever fashion they wish.

Another way to look at this issue is to ask this question: Are senators who disagree with the remarks of a particular senator on the third reading of a proposed bill obligated to rise to express that disagreement on the floor of the senate? And in the absence of their doing so, have they forfeited any later claim that the senator who rose to speak about the bill was not the authoritative voice of the senate on the matter? I have yet to encounter anyone, judge or legislator, who believes that such an obligation exists for senators who disagree with the remarks of some of their colleagues at third reading. Yet, if no such obligation exists, then why do we judges continue to view the few voices who speak in the legislative chamber as somehow authoritative on the subject?

Further, what possible legitimacy can there be to viewing the remarks of a few members of the senate at third reading on a particular bill as authoritative and binding on members of the House of Representatives, who later voted on that same bill? Does anyone contend that somehow the views of the senators who spoke at third reading were necessarily going to be communicated to the members of the House of Representatives or repeated by some member of that body? When subjected to this analysis, the whole notion of "legislative history," based upon the remarks of individual legislators, is simply nonsensical.

And when we are looking to "legislative history" for guidance by examining the remarks of the <u>opponents</u> to a particular piece of legislation (which the majority does in this case), then "legislative history" has even less value than nothing.  This is because legislators who oppose a particular bill might, intentionally or otherwise, attribute features to it that it does not possess.  Giving these legislators the benefit of the doubt, they might legitimately fear that a certain result will ensue if the bill is passed, but many of their colleagues (especially those voting in favor of the bill) might very well disagree.  And if they disagree, they are under no obligation to rise to say so, especially if they think they have the votes to pass the bill in the first place.  Thus, the absence of rebuttal to the negative assessments of the bill that the majority in this case quotes is, in my judgment, totally without significance.

I realize that (to date) the Supreme Court of Illinois has disagreed with my view of "legislative history."  See <u>People v. Collins</u>, 214 Ill. 2d 206, 214, 824 N.E.2d 262, 266 (2005). ("Where statutory language is ambiguous, *** we may consider other extrinsic aids for construction, such as legislative history and transcripts of legislative debates, to resolve the ambiguity").  Nonetheless, I hope that the supreme court might have occasion to reconsider the legitimacy of legislative history based upon the remarks of legislators (perhaps even in this case) and decide that it will no longer give legitimacy to this analysis.

Although the law employs many legal fictions, they ought to be useful and legitimate.  Using the remarks of individual legislators as a tool of legislative construction fails that test.