OPINION OF THE COURT
 

 Bellacosa, J.
 

 These two appeals bring before this Court novel questions regarding “Medicaid planning” in New York State. We must interpret and resolve intricately intertwined Federal and State laws and regulations as applied in the context of these related proceedings. The lead case,
 
 Matter of (Bipin) Shah,
 
 poses the question whether Mr. Shah is a resident of New York for purposes of determining eligibility to receive New York Medicaid benefits. The Appellate Division meticulously examined and applied the pertinent regulations in concluding that he was a New York resident. We now affirm.
 

 Given this decision, we also reach the question in the other case,
 
 Matter of (Kashmira) Shah,
 
 whether a spouse, qualified as guardian, is permitted to transfer to herself, for purposes of Medicaid planning, the entire assets of her incapacitated spouse pursuant to Mental Hygiene Law § 81.21. Upon a fastidious analysis, the Appellate Division approved the transfer authorized by Supreme Court. We, too, affirm.
 

 I.
 

 Bipin Shah lived in New Jersey with his wife, Kashmira, and their two children. On August 1, 1996, while at work in Suffolk County, New York, he was severely injured and lapsed into a coma. At first, he was hospitalized in Suffolk County. On September 29, 1996, at his wife’s request, he was transferred to Helen Hayes Hospital in Rockland County, just across the border from the family home in New Jersey. His comatose condition is not expected to improve. He is almost 50 years of age.
 

 
 *153
 
 On January
 
 9, 1997,
 
 Helen Hayes Hospital advised Mrs. Shah that private insurance benefits would soon be exhausted and “absent an accepted Medicaid application, Bipin and Kashmira Shah will be personally responsible for payment” of approximately $1,600 per day. Mrs. Shah executed a “Spousal Refusal,” a procedural benefit available in New York (but not New Jersey) by which spouses may decline to make their income and resources available for the cost of the other spouse’s care, without jeopardizing the needy spouse’s ability to receive Medicaid benefits. Indeed, the device aids and facilitates the entitlement to such medical assistance.
 

 Mrs. Shah next commenced a guardianship proceeding in Rockland County pursuant to Mental Hygiene Law article 81 and filed a Medicaid application for Mr. Shah. The goal of the guardianship proceeding was to effectuate Medicaid planning: to transfer all of Mr. Shah’s assets to the guardian spouse so she could use the assets to support herself and their children, and so Mr. Shah could qualify for New York medical assistance benefits. The hospital and Rockland County Department of Social Services (DSS) intervened in the guardianship proceeding and opposed the transfer. Supreme Court, Rockland County, held a hearing regarding this matter on February 5, 1997.
 

 On March 28, 1997, while the guardianship proceeding was pending, the Rockland County DSS denied the Medicaid application on the ground that Mr. Shah was not a resident of Rockland County. It transferred the Medicaid application to Suffolk County, which also denied the application because Mr. Shah was not a resident of New York State. Mrs. Shah requested a fair hearing.
 

 In May 1997, Supreme Court, Rockland County, authorized the appointment of Mrs. Shah as guardian and the transfer to herself of all Mr. Shah’s assets. The hospital and Rockland County DSS appealed.
 

 On June 12, 1997, New Jersey provided a letter to New York’s Department of Health (DOH) stating that New Jersey was “not disputing Bipin Shah’s residency status with regard to his right to apply for New Jersey Medicaid benefits.” The State of New York and Rockland County rely on this letter as a “letter agreement,” within the ambit and authorization of the Federal regulation’s “interstate agreements” (42 CFR 435.403 [k]).
 

 In July 1997, DOH upheld the Rockland and Suffolk County denials of Medicaid assistance on the fair hearing phase. Mrs.
 
 *154
 
 Shah next started a CPLR article 78 proceeding challenging this determination.
 

 On July 6, 1999, the Appellate Division, Second Department, decided the respective matters,
 
 Matter of (Bipin) Shah
 
 (the transferred article 78 proceeding regarding the DOH residency determination) and
 
 Matter of (Kashmira) Shah
 
 (the Rockland County appeal regarding the guardianship transfer). With respect to residency, it analyzed the pertinent Federal and State regulations and stated:
 

 “The [Medicaid rules] * * * are unambiguous, and neither this Court nor the respondent agencies have the power to rewrite the rules so as to make them conform with what may well be a more rational approach to the definition of residency. The determination under review must therefore be annulled”
 
 (Matter of [Bipin] Shah,
 
 257 AD2d 256, 260).
 

 This Court granted DOH and Rockland County DSS leave to appeal from that New York residency ruling in favor of the Shahs.
 

 With respect to the guardianship-transfer of assets phase of the matter, the Appellate Division affirmed Supreme Court, stating:
 

 “it is, or should be, clear that Mr. Shah, who had the unrestricted right to give his assets to his wife, or to his children, or to anyone else for that matter, at all times up to the moment of his terrible injury, did not, on account of that injury, lose that fundamental right merely because he is now incapacitated and financial decisions on his behalf must necessarily be made by a surrogate. The relief granted pursuant to Mental Hygiene Law article 81 is designed to permit an incapacitated person to do, by way of a surrogate, those essential things such a person could do but for his or her incapacity”
 
 (Matter of [Kashmira] Shah,
 
 257 AD2d 275, 282).
 

 This Court granted the hospital and Rockland County DSS leave to appeal from that ruling which also favored the Shahs.
 

 II.
 

 Just before the joint oral argument of these appeals, counsel for the Shahs formally moved to dismiss the appeals because of
 
 *155
 
 a settlement in the Federal tort action involving the underlying matter. The suit was brought on behalf of Mr. Shah as a result of the accident that caused his incapacitation. The settlement in Federal court provided for payment of the hospital expenses out of the proceeds of the settlement. Thus, Medicaid payment, as such, is no longer an issue.
 

 However, the settlement agreement provides that the amount of payment that will actually be made to the hospital is dependent upon this Court’s determination with respect to the residency and guardianship transfer of assets issues. We are satisfied that the legal issues intertwined in these matters do not render the appeals moot. Therefore, the motion to dismiss the appeals is denied.
 

 III.
 

 In
 
 Matter of (Bipin) Shah,
 
 we examine DOH’s administrative determination of “residency” pursuant to the pertinent regulations. DOH and Rockland County DSS argue that the DOH determination of New Jersey residency for Medicaid purposes was correct. DOH focuses on the fact that New Jersey residency was never disputed by New Jersey, as evidenced by the “letter agreement.” It asserts further that Federal regulations regarding the definition of residency for eligibility determinations do not apply unless residency is disputed. Furthermore, DOH stresses that Kashmira Shah’s “substituted intent” shows that she treats Mr. Shah as a New Jersey resident for all purposes other than Medicaid planning (including for diversity of jurisdiction to support the Federal lawsuit), and that she should not be allowed to “take advantage” of New York’s “spousal refusal” provisions in this manner and matter.
 

 Bipin Shah and
 
 amici curiae
 
 argue that, as reflected in the thorough decision at the Appellate Division, the Federal regulations set forth a straightforward definition of residency for Medicaid eligibility purposes and that, pursuant to that definition, Mr. Shah qualifies as a New York resident. We agree with that approach and conclusion.
 

 The core question here is, when faced with a Medicaid application, how should a New York Medicaid agency (here the County Department of Social Services) define residency for purposes of determining Medicaid eligibility? The answer is directly available. New York, like all other States, is guided and governed through the pertinent Federal regulations promulgated by the Health Care Financing Administration. 42 CFR part 435 defines “Eligibility in the States.” Subpart A (“General Provisions and Definitions”) states:
 

 
 *156
 
 “[t]his part sets forth, for the 50 States * * * The eligibility requirements and procedures that the Medicaid agency
 
 must use in determining
 
 and redetermining
 
 eligibility,
 
 and requirements it may not use” (42 CFR 435.2 [c]) (emphasis added).
 

 Subpart E (“General Eligibility Requirements”) contains the guidelines regarding “State residence” (42 CFR 435.403). It specifically defines
 
 “Who is a State
 
 resident” as:
 

 “A resident of a State is any individual who:
 

 “(1) meets the conditions in paragraphs (e) through (i) of this section; or
 

 “(2) Meets the criteria specified in an interstate agreement under paragraph (k) of this section” (42 CFR 435.403 [d] [emphasis added]).
 

 Appellants urge application of prong (2) of this definition to avoid the alternative qualification method referenced through prong (1). However, the proffered New Jersey “letter agreement” is neither an “interstate agreement[],” nor an agreement promulgated pursuant to an “interstate agreement [ ]” as defined in 42 CFR 435.403 (k).
 

 The terms of the New Jersey letter simply do not comply with that alternative, exceptional proviso, and that letter cannot trump the application and operation of prong (1). The letter does not purport to set forth “rules and procedures resolving cases of disputed residency,” and it does not “contain a procedure for providing Medicaid to individuals pending resolution of the case” (42 CFR 435.403 [k];
 
 compare, State of Georgia v Stuckey Health Care,
 
 189 Ga App 126, 375 SE2d 235 [reciprocal interstate agreement in place]). Nor does it constitute an agreement that may be used “other than [in] cases of disputed residency” because it is simply not an “interstate agreement[ ]” as contemplated by the Federal regulation (see, 42 CFR 435.403 [k]). It reflects merely a unilateral expression from a New Jersey employee that New Jersey will entertain Mr. Shah’s Medicaid application and will not dispute it on the basis of residency.
 

 That letter is a far cry from a bilateral “interstate agreement” and cannot displace a determination of New York residency based on plainly qualifying features found in prong (1) of 42 CFR 435.403 (d). That provision directs agencies to paragraphs (e) through (i) for guidance. The plain category applicable to Mr. Shah’s situation is (i),
 
 “Individuals Age 21 and Over”.
 
 The pertinent subpart is (3):
 

 
 *157
 
 “For any institutionalized individual who
 
 became incapable of indicating intent at or after age 21, the State of residence is the State in which the individual is physically present,
 
 except where another State makes a placement” (42 CFR 435.403 [i] [3] [emphasis added]).
 

 Appellants are not contending that New Jersey made a placement. Thus, Mr. Shah plainly falls under the core aspects of the primary category. He is institutionalized; he became incapacitated after age 21; and he is physically present in New York. The State of New York is his residence, plain and simple, for the operational purposes of 42 CFR 435.403 (i) (3).
 

 Appellants, nevertheless, rely on 42 CFR 435.403 (a), a “Requirement,” and 42 CFR 435.403 (j) (3), a “Specific prohibition,” to expel Mr. Shah from his (i) (3) category of New York residency. The “requirement” proviso is that:
 

 “The agency must provide Medicaid to eligible residents of
 
 the State,
 
 including residents who are absent from
 
 the State”
 
 (42 CFR 435.403 [a] [emphasis added]).
 

 The “specific prohibition” feature declares:
 

 “The agency may not deny or terminate a resident’s Medicaid eligibility because of that person’s temporary absence from
 
 the State
 
 if the person intends to return when the purpose of the absence has been accomplished, unless another State has determined that the person is a resident there for purposes of Medicaid” (42 CFR 435.403 [j] [3] [emphasis added]).
 

 Appellants insist that “the State” here means New Jersey, and Mr. Shah is actually absent from New Jersey, which should, therefore, pay his benefits. True, he is absent from New Jersey, but that is not determinative of the operative question. It is New York that is required to make the Medicaid determination, so New York is “the State” for purposes of construing these regulations. Thus, the “requirement” proviso (a) applies in such a way that New York “must” provide Medicaid to Mr. Shah if he is an eligible “resident,” and the “prohibition” proviso (j) (3) does not apply because Mr. Shah is certainly not temporarily absent from New York — he is undeniably institutionalized in a New York hospital.
 

 Instead, specified prohibitions (j) (1) and (j) (2) directly apply to Mr. Shah’s situation:
 

 
 *158
 
 “(1) The agency may not deny Medicaid eligibility because an individual has not resided in the State for a specified period.
 

 “(2) The agency may not deny Medicaid eligibility to an individual in an institution, who satisfies the residency rules set forth in this section, on the grounds that the individual did not establish residence in the State before entering the institution” (42 CFR 435.403 [j] [1], [2]).
 

 Ironically, these very prohibited bases for denials are proposed as appellants’ justification for what DOH declared when it rendered its flawed residency determination.
 

 We conclude that the Appellate Division’s New York residency ruling is well-founded and correct. The Appellate Division properly annulled the determination which was based on factors beyond the scope of the agency’s authority.
 

 IV.
 

 Since we are satisfied that Mr. Shah qualifies as a New York resident for purposes of Medicaid benefits, we turn to the second and related aspect of this couplet of appeals. Guardianship and the transfer of assets between spouses for Medicaid planning purposes, particularly in relation to the New York right of “spousal refusal,” are the next set of considerations.
 

 DOH and Rockland County DSS acknowledge that as a result of the Medicare Catastrophic Coverage Act of 1988, a community spouse need not liquidate the entirety of his or her assets in order to allow the institutionalized spouse to qualify for Medicaid benefits. However, their argument includes the balance wheel that the community spouse should be allotted only a “minimum monthly maintenance needs allowance” and a “community spouse resource allowance.” They assert that policy and fiscal goals are to prevent hoarding of excess resources from medical care creditors by a community spouse in order to qualify the needy spouse for Medicaid. Appellants assert that the “spousal refusal” safeguard applies to assets that the refusing spouse already possesses but was not meant to allow a community spouse to receive even more assets from her institutionalized spouse in order to shield them, as well.
 

 Kashmira Shah and
 
 amici curiae
 
 argue that the guardianship order and transfer is proper pursuant to the Mental Hygiene Law, State and Federal law, and the doctrine of substituted judgment. Again, we agree with the Appellate Division ruling, which affirmed Supreme Court’s approach.
 

 
 *159
 
 Since shortly after Mental Hygiene Law article 81 was enacted, various sources of authority have described transfers for Medicaid planning as being within the scope of the article
 
 (see, Matter of John XX.,
 
 226 AD2d 79,
 
 lv denied
 
 89 NY2d 814; Bailly, Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.21, 2000 Supp Pamph, at 84;
 
 see also,
 
 Russo and Rachlin, New York Elder Law Practice, § 5.42, at 229 [1998 ed]). We now confirm that a guardian spouse is permitted to effectuate this kind of Medicaid planning on behalf of an incapacitated individual pursuant to Mental Hygiene Law article 81.
 

 Section 81.21 provides, in pertinent part, that a court may authorize a guardian:
 

 “to exercise
 
 those powers necessary and sufficient
 
 to manage the property and financial affairs of the incapacitated person; to provide for the maintenance and support of the incapacitated person, and those persons depending upon the incapacitated person; to transfer a part of the incapacitated person’s assets to or for the benefit of another person on the ground that the incapacitated person would have made the transfer if he or she had the capacity to act” (Mental Hygiene Law § 81.21 [a] [emphasis added]).
 

 The potentiality invested in a guardian includes the power to “make gifts” (Mental Hygiene Law § 81.21 [a] [1]), to “provide support for persons dependent upon the incapacitated person” whether or not such support is legally required (Mental Hygiene Law § 81.21 [a] [2]), and to “apply for government * * * benefits” (Mental Hygiene Law § 81.21 [a] [12]).
 

 In determining whether to approve a specific application for a transfer of assets, the court shall consider several factors, including: “whether the donees or beneficiaries of the proposed disposition are the natural objects of the bounty of the incapacitated person and whether the proposed disposition is consistent with any known testamentary plan or pattern of gifts” (Mental Hygiene Law § 81.21 [d] [4]); and “whether the proposed disposition will produce estate, gift, income or other tax savings which will significantly benefit the incapacitated person or his or her dependents” (Mental Hygiene Law § 81.21 [d] [5]).
 

 Considering these factors, a court may grant the application if satisfied by clear and convincing evidence that, among other
 
 *160
 
 things, “a competent, reasonable individual in the position of the incapacitated person would be likely to perform the act or acts under the same circumstances” (Mental Hygiene Law § 81.21 [e] [2]). We agree with the common sense verity uttered by the Appellate Division that the transfer here was properly authorized because “[t]here can be no quarreling with the Supreme Court’s determination that any person in Mr. Shah’s condition would prefer that the costs of his care be paid by the State, as opposed to his family”
 
 (Matter of [Kashmira] Shah,
 
 257 AD2d 275, 282,
 
 supra, lv granted
 
 94 NY2d 755).
 

 Rockland County DSS seizes on the “transfer
 
 a part
 
 of the * * * assets” phraseology in an effort to establish that the transfer of the entire assets here was improper because of the Medicaid planning aspect of the transfer (Mental Hygiene Law § 81.21 [a] [emphasis added];
 
 see also,
 
 Mental Hygiene Law § 81.21 [b]). Appellants would have us essentially say that if Mrs. Shah is going to apply for Mr. Shah’s Medicaid benefits, she cannot transfer
 
 all
 
 of his assets to herself, since she is also invoking the right of spousal refusal. Appellants misconstrue the law and conflate the guardianship issue, a matter of court discretion, with strictly guided agency Medicaid eligibility calculations. We are not convinced that when State courts make their article 81 determinations, they are explicitly limited by rubrics that apply in the context of decisions made by State administrative agencies in these circumstances
 
 (compare,
 
 New York’s option of “spousal refusal” with New Jersey’s lack of same).
 

 The specifically enumerated potential powers of the New York guardian are unlimited and certainly not contingent on the particular purpose for the transfer — the guardian can make gifts, provide support for dependents and, simultaneously, apply for government benefits
 
 (see,
 
 Mental Hygiene Law § 81.21 [a]). The only “limitation” is that of the doctrine of substituted judgment — the guardian’s actions must “take[ ] in account the personal wishes, preferences and desires of the [incapacitated] person” (Mental Hygiene Law § 81.01;
 
 see also,
 
 NY Law Rev Commn Comments, McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.21, at 376).
 

 Appellants urge that under the Medicaid statutes, resources that exceed the “community spouse resource allowance” may be taken into account in determining the institutionalized spouse’s eligibility
 
 (see,
 
 42 USC § 1396r-5 [c] [2]; § 1396r-5 [f] [2] [A]; Social Services Law § 366-c [2] [d]). If necessary, the entirety of the institutionalized spouse’s assets will not be ap
 
 *161
 
 plied toward medical expenses, and support can be transferred to the spouse in order to bring her income up to the “minimum monthly maintenance needs allowance” (see, 42 USC § 1396r-5 [d] [3]; Social Services Law § 366-c [4] [b]). However, in order to receive an increased amount of support from the institutionalized spouse, the community spouse must show “special circumstances” at an administrative fair hearing (42 USC § 1396r-5 [e]; Social Services Law § 366-c [8] [a]).
 

 Yet, both Federal and New York State law provide for the right of “spousal refusal” exercised by Mrs. Shah, which essentially permits avoidance of these resource allowance rules and limitations. The “spousal refusal” rule indicates that Medicaid must be provided to the institutionalized spouse who meets eligibility requirements even if the community spouse has income or resources in excess of the community spouse resource allowance, as long as the State may seek recovery of the cost of medical assistance from the community spouse (42 USC § 1396r-5 [c] [3]; Social Services Law § 366 [3] [a]). Furthermore, there is no look-back period with respect to a transfer of assets between spouses for purposes of determining medical assistance eligibility (42 USC § 1396p [c] [2] [B] [i]; Social Services Law § 366 [5] [d] [3] [ii] [A]).
 

 We hold that the interplay of these provisions allows an institutionalized spouse, through guardianship authorization, to transfer all of that spouse’s assets to a community spouse; the latter may simultaneously refuse to have those assets included in the calculation of income and resources available to the institutionalized spouse for Medicaid assistance
 
 (compare, Matter of John XX.,
 
 226 AD2d 79,
 
 supra
 
 [only a partial asset transfer was made by a guardian to the incapacitated person’s children because the look-back period had to be taken into consideration]).
 

 These New York Medicaid planning options may, as is apparently the case here, provide a technical and even potentially anomalous route that is the only pathway through which the incapacitated spouse could actually qualify for Medicaid. Especially considering these authorized policy choices, appellants’ proposed strictures are simply not justified in either the Mental Hygiene Law or in the Federal or State Medicaid structures and are not problems of our legal cognizability.
 

 Appellants further decry the dual standard that they see emanating from the Appellate Division decision. We disagree with this purported problem. A gift giver (regardless of whether
 
 *162
 
 the giver functions through a guardian) can desire to transfer far more than the statutory minimum to which a support seeker, relegated to a legal proceeding for obtaining the assets, is entitled
 
 (compare, Matter of Gomprecht v Gomprecht,
 
 86 NY2d 47;
 
 compare also, Matter of Golf v New York State Dept. of Social Servs., 91
 
 NY2d 656). It is not the
 
 giving of
 
 the gift that alters the immediate accessibility for calculation purposes; it is the “spousal refusal” that temporarily blocks that governmental advantage. Indeed, it is appellants’ position which advocates a different dual standard regarding how capable versus incapacitated persons would be treated for purposes of Medicaid planning. Their theory would also produce a disparity in how guardian community spouses who wish to exercise their legal right of “spousal refusal” would be treated in relation to their otherwise equally operative guardianship powers.
 

 Moreover, as appellants acknowledge, the exercise of this right of “spousal refusal” does not deprive the State of all opportunity to seek recoupment from a financially qualified community spouse. It just requires a reimbursement process to obtain resources from the community spouse after Medicaid benefits are paid, instead of an initial calculation stage that might limit the amount of Medicaid benefits to be provided. We are not persuaded by DOH’s dissatisfaction with the practical complications of its eventual recoupment option. Its objection offers an insufficient legal basis for determining that the methodology approved by the courts below is foreclosed.
 

 Next, appellants rely significantly on language taken from this Court’s
 
 Gomprecht
 
 decision, explaining that community spouses are not entitled to an “excessive” amount of income and resources while their spouses are institutionalized at Medicaid expense
 
 (see, Matter of Gomprecht v Gomprecht, supra,
 
 at 51). That case and that particular language are inapposite here.
 

 Although they are opposite sides of the same coin, the instant dispute is less about the rights of the community spouse for purposes of support-mandated Medicaid calculations than it is about the rights of the institutionalized spouse to be the subject of Medicaid planning, which rights are plainly prescribed by the Mental Hygiene Law, after serious deliberation and enactment
 
 (see,
 
 Mental Hygiene Law §§81.01, 81.21; Mem of Assemblyman Koppell, 1992 NY Legis Ann, at 433-434). In this respect, we reiterate this cogent portion of Justice Bracken’s opinion at the Appellate Division:
 

 “The complexities [of the law] * * * should never
 
 *163
 
 be allowed to blind us to the essential proposition that a man or a woman should normally have the absolute right to do anything that he or she wants to do with his or her assets, a right which includes the right to give those assets away to someone else for any reason or for no reason. * * * We would only amplify this by saying that no agency of the government has any right to complain about the fact that middle class people confronted with desperate circumstances choose voluntarily to inflict poverty upon themselves when it is the government itself which has established the rule that poverty is a prerequisite to the receipt of government assistance in the defraying of the costs of ruinously expensive, but absolutely essential, medical treatment”
 
 (Matter of [Kashmira] Shah,
 
 257 AD2d 275, 282-283,
 
 supra).
 

 We have considered all of appellants’ remaining arguments and conclude that they do not alter or affect the analyses and results we have reached in these companion cases.
 

 Accordingly, the orders of the Appellate Division should be affirmed, with costs, in each appeal.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick, Wesley and Rosenblatt concur.
 

 In each case: Order affirmed, with costs.