*975 OPINION OF THE COURT
Geoffrey J. O’Connell, J.
Following a hearing commenced on December 15, 2006 and continued on January 16, 2007, this court determined that AT was an incapacitated person and appointed her sister TT as her personal needs guardian and Frank G. D’Angelo, Jr. as her property management guardian.
The initial Mental Hygiene Law article 81 petition was brought by AM who sought to be appointed guardian. AM now moves to reargue the court’s decision and judgment. Separately, Mr. D’Angelo applies to the court for authority to retain counsel to commence an eviction proceeding. The real property in question is occupied by AM.
Background
The testimony adduced at the hearing established that AM and AT had known each other since the 1960s. The relationship had varied over the years. AM had married, divorced and then married another woman and this second marriage has never been dissolved. AM has a daughter from one of these marriages. AT married, but was widowed in the 1970s and has no children.
AT was an executive with Georgette Klinger, an operator of beauty salons and manufacturer of beauty products. She retired after 35 years with the company in 1999. AM has been disabled from employment since 1985 due to cluster headaches. His income has been about $20,000 a year derived from Social Security disability.
At the time of her retirement AT owned an apartment at 30 Beekman Place in Manhattan as well as the home in East Atlantic Beach which AM currently occupies. At the time of the hearing AT had over $1,000,000 in bank deposits and annuities. She was also receiving a Social Security pension. From 1980 to 2003 or 2004 AM had a rent-subsidized apartment in Manhattan which he had shared with his mother until her death in 1986. When he surrendered the apartment, AM moved with AT to the East Atlantic Beach home. AT’s Beekman Place apartment was sold under AM’s direction. He testified that it was sold for $335,000 and the funds deposited in Citibank. Although the court requested that the closing documents be produced, they never were.
AM had accompanied AT on family visits and other family occasions for a number of years. They spent their weekends together at the East Atlantic Beach home.
*976 One neighbor in East Atlantic Beach, Mary Kampa, who is a nurse, had known AT and AM for approximately nine years. She described their relationship over the initial years as good. Another neighbor, Denise Isola, testified that starting shortly before the time that AT permanently moved to the East Atlantic Beach home, she had become forgetful and less social. She also read less and stopped doing crossword puzzles which had been a favorite activity. She was neither as clean nor neat as she had been in the past. From then on, according to Denise Isola, AT’s course was downhill.
Denise Isola testified that she urged AM to take AT to the doctor, but AM did not like doctors. Mrs. Isola made appointments for AT to see doctors and took her for doctor visits. She believed that AM was not diligent in seeing to it that AT took her medications.
On December 23, 2005 AT stumbled on a rubber door mat and fell down three patio steps breaking her hip. After three weeks in the Long Beach hospital, she moved to a rehabilitation unit in the same institution. AM was dissatisfied with the care in the rehabilitation unit and had AT moved to Park Avenue Rehabilitation a short distance away. Kerri Gustafson, a social worker at Park Avenue, testified that AM visited AT regularly and that they appeared to be a loving couple. She had no hesitancy releasing AT to return home with AM.
Upon her release home AT required a walker to ambulate. AM engaged no professionals to assist in her care. According to AM, AT suffered from diarrhea and he would clean and bathe her. He would engage Mary Kampa’s daughter, a girl in her early teens, to help with the household chores. Neighbors Denise Isola and Mary Kampa described the house as cluttered, with diapers and medical equipment all around. Because of her hip, AT was confined to the first floor and seldom moved from the living room couch. Nevertheless, Sandra Mennella, a case worker from Adult Protective Services, testified that on six or seven visits she had found AT neat and clean as was the apartment. However, she also testified that this was before the home services provided to AT as part of the discharge plan from Park Avenue Rehabilitation came to an end.
AM testified that he suffers from emphysema and has bouts of congestive heart failure because of two bad heart valves. Denise Isola testified that sometime during the 1990s AM had suffered what appeared to be a stroke and was unable to speak for a period of time. On another more recent occasion he passed *977 out on the street and the paramedics surmised that it was due to a viral infection.
On or about May 26, 2006, AM went to St. Francis Hospital with regard to his heart condition and was unexpectedly admitted. He called Mary Kampa from the hospital emergency room to inform her that AT was home alone. Mary Kampa testified that she and her daughters, ages 12 and 14, went to the house and found AT a “filthy mess” with fecal matter on her hands. The house was in bad shape and Mary Kampa felt that she and her daughters could not provide the care AT required. When Denise Isola was informed of the circumstances by Mary Kampa, she called TT who came and took AT to Pennsylvania to stay with her.
Procedural History
AM commenced a guardianship proceeding pursuant to article 81 of the Mental Hygiene Law by an order to show cause signed by Justice Asarch on July 20, 2006. David L. Levine was appointed court evaluator. TT submitted a cross petition sometime in August 2006. A proceeding was held in open court on September 6, 2006 at which AT appeared. TT also appeared and was represented by counsel. Thereafter Justice Asarch appointed Sandra Bussell, Esq., as a temporary guardian, “to evaluate [AT’s] prior and current living arrangements, to ensure proper supervision and assistance in such residence(s).” The temporary guardian issued a report dated September 21, 2006 recommending that TT be made guardian of the person and an independent property guardian be appointed. She recommended that the most suitable living circumstances for AT would be a nursing home.
On October 3, 2006, Justice Asarch issued an order discharging the temporary guardian and recusing himself. Meanwhile, TT commenced a guardianship proceeding in Pennsylvania.
A hearing on the New York petition and cross petition was commenced by this court on December 15, 2006 with AT present. It was continued on January 16, 2007, with AT no longer present, the court having satisfied itself that she was not capable of appreciating the nature of the proceeding or contributing to it in any meaningful way because of her deteriorated mental state.
During the hiatus, the court evaluator gained access to the last will and testament of AT on file with the Surrogate’s Court, Nassau County, pursuant to SCPA 2507 (3). He reported to the *978 court that the will executed in 2004 provided that AM receive all real property and insurance proceeds. The residuary estate was to be divided with AM receiving 20%, but in the event he should predecease, then his sister and daughter each receiving 10%. The balance would go to various members of AT’s family.
A subsequent will was prepared in 2005 by an Evan S. Cowit who was interviewed by the court evaluator. Mr. Cowit advised the court evaluator that he met AT for the first time when he prepared the will, an unexecuted copy of which was furnished to the court. This will also leaves the real property to AM. The will refers to “The AT Revocable Trust” which was apparently never created. It further provides that, should the trust not be created, 15% of the residuary estate should go to AM, or, if he predeceases, in equal shares to his sister, daughter and two granddaughters; 75% to members of AT’s family; and 5% each to AM’s sister, daughter and two granddaughters. As the court evaluator pointed out, this amounts to 110% of the residuary estate.
The court evaluator had originally recommended that AM be appointed personal needs guardian, but that the court appoint a geriatric medical expert to consult with AM on AT’s care and that there be an independent guardian of the property. At the conclusion of the hearing, however, the court evaluator opined that the relationship between AT and AM was irreparably broken by her condition and the period of separation. He recommended an independent guardian.
Following completion of the hearing, the court determined that the appointment of a guardian was necessary and appropriate. TT was appointed guardian of the person and it was determined that there should be an independent guardian of the property. An order and judgment was signed on April 2, 2007 in which TT was appointed personal needs guardian and Frank D’Angelo, Esq., was appointed guardian of the property.
Discussion
(a) Accessibility
AM seeks an order modifying the powers granted the personal needs guardian TT with respect to the social aspects of AT so as to afford him contact with AT.
The evidence establishes that prior to May 26, 2006 AT had a long and close relationship with AM. However, on September 6, 2006, after she had been living in Pennsylvania with her sister for three months, the following exchange is characteristic of Justice Asarch’s inquiry of AT as to her desires:
*979 “the court: Why don’t you want to continue with AM?
“at: Well, he was very difficult to live with. You know, he had his, a lot of friends, his own friends, and whatever, and that’s about all I can think of at the moment.”
Justice Asarch directed that AM be afforded access to AT while she remained in Pennsylvania with her sister.
In opposing AM’s application, TT avers that AM gets confused and ignores their schedule for contact with AT. She claims that he calls in the middle of the night and, when there is no answer, leaves threatening messages.
The court will entertain submission by AM of a schedule for phone calls and personal visits. TT may submit a counter proposal. No telephone calls or personal visits outside an agreed upon or court imposed schedule need be accepted. Should an agreement be unattainable, the court will ask the property management guardian to interview AT and offer suggestions.
(b) The Real Property and Gifting
AM seeks to have the powers of the property management modified in such a way as would (1) permit AM to remain in the East Atlantic Beach home, and (2) provide for gratuitous transfers to AM as may be necessary for him to remain there, either as gifts or as support for a person dependent on the incapacitated person.
In Matter of Shah (Helen Hayes Hosp.) (95 NY2d 148 [2000]), the Court of Appeals held that Mental Hygiene Law § 81.21 authorizes a guardian to make gifts and provide for those dependent on the incapacitated person.
“In determining whether to approve a specific application for a transfer of assets, the court shall consider several factors, including: ‘whether the donees or beneficiaries of the proposed disposition are the natural objects of the bounty of the incapacitated person and whether the proposed disposition is consistent with any known testamentary plan or pattern of gifts’ (Mental Hygiene Law § 81.21 [d] [4]); and ‘whether the proposed disposition will produce estate, gift, income or other tax savings which will significantly benefit the incapacitated person or his or her dependents’ (Mental Hygiene Law § 81.21 [d] [5]).” (Matter of Shah at 159.)
Before approving gifts or support, the court must be satisfied by *980 clear and convincing evidence that “a competent, reasonable person in the position of the incapacitated person would be likely to perform the act or acts under the same circumstances.” (Mental Hygiene Law § 81.21 [e] [2]; Matter of Shah, supra at 160.) “[I]n enacting Mental Hygiene Law article 81, the Legislature gave statutory recognition to the common-law doctrine of ‘substituted judgment’ (Matter of John XX., 226 AD2d 79, 83 [1996], lv denied 89 NY2d 814) by expressly authorizing transfers of this kind” (Matter of Burns, 287 AD2d 862, 864 [3d Dept 2001] [internal quotation marks omitted]).
Mental Hygiene Law § 81.21 (b) provides that where a petitioner or the guardian proposes to exercise a power involving the transfer of a part of the incapacitated person’s assets, certain information should be included in the application. In his article 81 petition AM did not seek the power to make gifts, transfer assets or provide for himself as a person dependent upon AT. The guardian is not applying for such powers, but rather seeks to commence an eviction proceeding assumedly to oust AM from possession of the East Atlantic Beach property.
Generally, the duties of a guardian under article 81 “are to be discharged with their own determination of the proper course of conduct.” (Matter of Delavan, 52 Misc 2d 315, 317 [Onondaga County Ct 1966].) Thus, any application for support or gratuitous transfers ought, in the first instance, be made to the guardian. Although served with AM’s order to show cause, the property management guardian did not address the application, but instead sought leave to commence an eviction proceeding.
The application with respect to support and gratuitous transfers is adjourned until August 24, 2007. Applicant may have until July 27, 2007 to submit whatever he may deem appropriate to satisfy the statutory requirement of clear and convincing evidence that a fully competent person in AT’s position would regard the proposed actions as reasonable and appropriate. The property management guardian shall, by the final submission date, inform the court as to whether he favors or opposes the requests. Thereafter, upon request, either applicant AM or TT as next of kin will be granted additional time to seek to have that determination modified or revoked. (Matter of Tobin v Security Trust Co. of Rochester, N.Y., 21 AD2d 743 [4th Dept 1964], affd without op 16 NY2d 910 [1965].)
The court deems as relevant to this application an accounting for AM’s management of AT’s affairs for the period 2004 through May 26, 2006 and in particular the proceeds of the sale *981 of the Beekman Place property and their disposition. (See, Matter of Burns, 287 AD2d 862, 864 [3d Dept 2001].)
(c) Counsel Fees
The attorney for AM applied for an award of attorney’s fees to be included in the judgment which the court did not grant. She now seeks to reargue.
Mental Hygiene Law § 81.16 (f) provides that when a petition is granted and, if the court otherwise deems it appropriate, reasonable compensation may be awarded to the attorney for petitioner. Pursuant to that statutory authorization, the attorney for TT was awarded a fee. Counsel for AM now cogently argues that AM brought the initial article 81 proceeding which was found to be meritorious although the court ultimately determined that other individuals would be more appropriate guardians. The proceeding was complicated by TT’s removal of AT to Pennsylvania and her initiation of a competing proceeding there.
Upon reflection, the court finds that its initial interpretation of Mental Hygiene Law § 81.16 (f) as not authorizing a fee where the petitioner is not appointed guardian was in error. (See, Matter of Spear, 1 Misc 3d 910[A], 2004 NY Slip Op 50014[U] [Sup Ct, Suffolk County 2004].) Based upon the affidavit of services previously submitted averring 124 hours of professional services, counsel for AM is awarded a fee of $16,000 to be paid out of the incapacitated person’s estate.