*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  November 5, 2015                   520621
_____

GOOD SHEPHERD VILLAGE AT
   ENDWELL, INC.,
              Respondent,

      v                                    OPINION AND ORDER

PETER YEZZI et al.,
              Appellants.
_____

Calendar Date:  September 10, 2015

Before:  Lahtinen, J.P., Garry, Lynch and Devine, JJ.

_____

     Woods Oviatt Gilman, LLP, Rochester (Rene H. Reixach of
counsel), for appellants.

     Hinman Straub, PC, Albany (David T. Luntz of counsel), for
respondent.

_____

Lynch, J.

     Appeal from an order of the Supreme Court (Lebous, J.),
entered December 22, 2014 in Broome County, which, among other
things, granted plaintiff's motion for partial summary judgment.

     Plaintiff is a not-for-profit corporation that owns and
operates Good Shepherd Village at Endwell (hereinafter GSV),
located in the Town of Union, Broome County, a Fee-For-Service
Continuing Care Retirement Community (hereinafter CCRC)
established pursuant to Public Health Law article 46-A, which was
enacted in 2004.  GSV is the first approved and licensed CCRC in
the state.  A CCRC is defined as a facility established "to
provide a comprehensive, cohesive living arrangement for the
elderly," with statutorily required residential options ranging

from independent living units to nursing facility services, all "pursuant to the terms of the fee-for-service continuing care contract on a fee-for-service schedule" (Public Health Law § 4651 [8] [a]). A fee-for-service continuing care contract is defined as "a single continuing care retirement contract that provides long-term care and other services on a per diem, fee-for-service or other agreed upon rate" (Public Health Law § 4651 [9]). The statutory objective is "to encourage affordable care options for middle income seniors" (Public Health Law § 4654). Essentially, this model provides for lifetime care at the same upscale facility, initially on a private pay basis and, as necessary, with payment through Medicaid.

In 2009, defendant Peter Yezzi and his spouse, Hazel Yezzi (hereinafter collectively referred to as the Yezzis),[1] applied for and were granted admission to GSV. In August 2009, GSV and the Yezzis entered into a fee-for-service continuing care contract (hereinafter the contract), which required the Yezzis to pay an entrance fee of $143,850, together with a basic monthly fee totaling $2,550 to cover the cost of an independent living unit. Notably, the contract specified that "nursing facility services . . . are at an additional charge and are not included in the Monthly Fee." In October 2012, Hazel Yezzi was admitted into the skilled nursing facility pursuant to an admission agreement executed on her behalf by Peter Yezzi. She resided there until she passed away in January 2014. In the meantime, Hazel Yezzi executed a comprehensive power of attorney to Peter Yezzi and defendant Joseph P. Yezzi, which they utilized in January 2013 to apply for Medicaid on her behalf. Around this time, Hazel Yezzi notified GSV that some of the Yezzis' assets had been transferred to Peter Yezzi for Medicaid planning purposes. Moreover, in March 2013, Peter Yezzi completed an updated financial information form disclosing that several accounts, totaling $741,000, were now owned by Peter Yezzi and Joseph Yezzi. Medicaid coverage was approved in July 2013.

---

[1] Hazel Yezzi, named as a defendant, passed away during the pendency of this action and Supreme Court substituted defendant Joseph P. Yezzi, who was already a named defendant, individually, as executor of her estate.

At issue on this appeal is the payment due GSV for services that Hazel Yezzi received while in the skilled nursing facility, amounting to over $106,000. After the parties reached an impasse as to whether the Yezzis were obligated to pay these charges through their personal resources, as GSV asserts, or whether GSV was obligated to accept a reduced Medicaid payment, as defendants contend, plaintiff commenced this action in September 2013. Plaintiff maintains that the Yezzis disclosed assets valued at $1 million, with annual income of $25,000, in their admission application.[2] Based on this disclosure, Michael Keenan, plaintiff's president and chief executive officer, averred that GSV calculated that it would not need to start subsidizing the cost of the Yezzis' room and board for 15.2 years and, thus, accepted the application. Contending that the Yezzis were obligated to first utilize the funds initially disclosed during the application process to pay for the services provided, plaintiff claims that the transfer of Hazel Yezzi's funds constitutes a breach of contract and a fraudulent conveyance in violation of the Debtor and Creditor Law. Plaintiff also seeks a declaration that the contract complies with Medicaid law. Defendants answered and counterclaimed, asserting that GSV violated state and federal laws for failing to accept Medicaid as payment in full for the services at issue, engaged in deceptive business practices in violation of General Business Law § 349 and breached the contract.

Finding that the Yezzis were contractually obligated to expend the assets disclosed upon admission to privately pay for the costs of their care until such time that Medicaid was necessary, Supreme Court granted plaintiff's motion for summary judgment on both the breach of contract and fraudulent conveyance claims. In addition, the court concluded that the contract and admission agreement complied with both federal and state law and dismissed defendants' counterclaims. Defendants appeal and we affirm.

---

[2] Although defendants denied this contention in their answer, and the record does not include the underlying application, Peter Yezzi's March 2013 financial information statement reports assets valued at $751,000,

Generally, with respect to admission practices, stand-alone nursing homes are prohibited from requiring that residents waive or delay their eligibility or application for Medicaid benefits (see 42 USC § 1396r [c] [5] [A] [1] [I], [II]; 10 NYCRR 415.3 [b] [3], [4]). Further, Public Health Law § 4655 (3) specifies that "[n]othing in this article [46-A] shall be construed to enlarge, diminish or modify . . . medical assistance eligibility under title eleven of article five of the social services law." It is also established that an institutionalized spouse may transfer all of his or her assets to a community spouse for Medicaid eligibility purposes (see Matter of Shah [Helen Hayes Hosp.], 95 NY2d 148, 161 [2000]). Notwithstanding the foregoing, section 6015 (a) (2) of the federal Deficit Reduction Act of 2005 amended the Social Security Act by adding a provision for the "[t]reatment of continuing care retirement communities admission contracts" (Pub L 109-171, § 6015 [a] [2], 120 Stat 4, 65 [Feb. 8, 2006]). That provision states that contracts for admission to a "[s]tate licensed, registered, certified, or equivalent [CCRC] . . . , including services in a nursing facility that is part of such community, may require residents to spend on their care resources declared for the purposes of admission before applying for medical assistance" or Medicaid (42 USC § 1396r [c] [5] [B] [v]).

To operate as a CCRC, GSV was required to obtain a certificate of authority from the state, including a review of "the proposed forms of contracts to be entered into with residents of the community" (Public Health Law § 4655 [2] [c]). In a 2006 administrative directive, the Department of Health (hereinafter DOH) stated that, consistent with federal law, residents with contracts with a state-certified and licensed CCRC "may be required to spend on their care resources declared for purposes of admission before applying for Medicaid" and that, under certain circumstances, an individual's paid entrance fee to a CCRC "will be considered a resource when determining Medicaid eligibility." Summarizing federal law (see 42 USC § 1396r [c] [5] [B] [v]), DOH further explained that "CCRCs are paid primarily with private funds" and that, following the Deficit Reduction Act of 2005, certified CCRCs "may require in their admission contracts that residents spend their resources declared for the purposes of admission on their care, before they apply

for Medicaid."  Based on the foregoing, we agree with plaintiff that the contract could require a resident to first spend the resources identified upon admission before applying for Medicaid, in compliance with both state and federal law.  As Supreme Court recognized, the essence of the CCRC financial model requires a tradeoff between the resident and the facility, in which the resident must disclose and spend his or her assets for the services provided, while the facility must continue to provide those services for the duration of the resident's lifetime even after private funds are exhausted and Medicaid becomes the only source of payment.  With this long-term commitment, the facility necessarily must evaluate the financial feasibility of accepting a resident in the first instance.

Pertinent here, the contract provided that the Yezzis could "not transfer assets represented as available in [their] application to be a [r]esident of [GSV] for less than fair market value, unless the transfer [would] not impair [their] ability to pay [their] financial obligations to [GSV]."  The contract further required the Yezzis to "make every reasonable effort to meet [their] financial obligations" to GSV and prohibited them from making "any transfers or gifts after actual occupancy, which would substantially impair [their] ability or the ability of [their] estate to satisfy [their] financial obligations to [GSV]."  Further, the contract specifies that the financial information disclosed with their application was "a material part of this [contract], . . . [that was] incorporated as a part of this [contract]."  Although, as defendants correctly contend, the contract does not affirmatively state that the Yezzis must expend the private resources identified with their application, it does expressly preclude the transfer of such resources without fair consideration.

Given the long-term nature of the contract, which expressly embraced the prospect of nursing facility care, we agree with Supreme Court that the admission agreement is supplemental to, and does not supercede, the contract.  We recognize that, under the admission agreement, the Yezzis were required to "pay for, or arrange to have paid for by Medicaid, . . . all services provided by [GSV]" (emphasis added).  We are not, however, persuaded by defendants' interpretation that this disjunctive provision

required plaintiff to accept Medicaid as an alternative payment source. Construed together, the contract and admission agreement are actually compatible in that the CCRC financial model anticipates that, upon depletion of a resident's personal resources, Medicaid will be the ultimate source of payment — and plaintiff is contractually obligated to accept Medicaid while continuing to provide the same services. Consistently, addendum X to the admission agreement specifies that, "[i]t is the responsibility of residents, and those who assist them, to use the residents' assets and income to pay the costs associated with their residency and health care."

Nor are we persuaded by defendants' contention that Public Health Law article 46-A only provides for a limited exception to the general Medicaid rules that permits a CCRC to utilize the entrance fee, but not more, before a resident can become Medicaid eligible. An "entrance fee" is defined as "an initial or deferred transfer to an operator of a sum of money, made or promised to be made by a person or persons entering into a fee-for-service continuing care contract, for the purpose of ensuring services pursuant to such contract" (Public Health Law § 4651 [6]; see Public Health Law § 4659 [1], [2]). Once a resident takes occupancy, the entrance fee is partially refundable, subject to the operator's right to retain two percent per month of the occupancy and no more than four percent for processing (see Public Health Law § 4660 [2]). By comparison, the exception authorized under the Deficit Reduction Act of 2005 speaks to the "resources declared for the purposes of admission" (42 USC § 1396r [c] [5] [B] [V]), and not just the entrance fee. As indicated above, GSV evaluated the Yezzis' total resources in determining whether to grant their admission application.

In view of the foregoing, Supreme Court properly determined that the undisputed transfer of Hazel Yezzi's assets for less than fair market value constitutes a breach of contract. Correspondingly, since the transfer preceded her approval for Medicaid coverage, which, in any event, would ultimately only cover payment at a reduced rate, we further agree that the transfer constitutes a fraudulent conveyance under Debtor and Creditor Law § 273. Finally, defendants' contention that plaintiff engaged in a deceptive practice in violation of General

Business Law § 349 (a) is without merit and was properly dismissed.

Lahtinen, J.P., Garry and Devine, JJ., concur.


ORDERED that the order is affirmed, with costs.



ENTER:

Robert D. Mayberger
Clerk of the Court